# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
November 10, 2004 Session

## STATE OF TENNESSEE v. ROBERT FAULKNER

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 99-07635      Chris Craft, Judge**

---

**No. W2001-02614-SC-DDT-DD - Filed January 28, 2005**

---

The defendant, Robert Faulkner, was convicted of the first degree premeditated murder of his wife, Shirley Faulkner. The jury imposed a sentence of death based upon the aggravating circumstance that the defendant was previously convicted of one or more violent felonies. See Tenn. Code Ann. § 39-13-204(i)(2) (1997). The Court of Criminal Appeals affirmed. On automatic appeal under Tennessee Code Annotated section 39-13-206(a)(1) (2003), we designated the following issues for oral argument:[1] 1) whether the trial court improperly excluded testimony at the guilt phase regarding Faulkner's "diminished capacity"; 2) whether the trial court committed harmful error in its instructions defining "intentionally" and "knowingly"; 3) whether the failure of the verdict form to recite that the jury found the aggravating circumstance "beyond a reasonable doubt" rendered the verdict invalid; and 4) whether the sentence of death is disproportionate or invalid under the mandatory review of Tennessee Code Annotated section 39-13-206(c)(1) (2003). Having carefully reviewed these issues and the issue of photographic evidence raised by Faulkner, we find no merit to his arguments. Accordingly, we affirm the judgment of the Court of Criminal Appeals.

**Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the Court of Criminal Appeals Affirmed**

JANICE M. HOLDER, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and E. RILEY ANDERSON, and WILLIAM M. BARKER, JJ., joined. ADOLPHO A. BIRCH, JR., J. filed a concurring and dissenting opinion.

Robert C. Brooks, Memphis, Tennessee, for the appellant, Robert Faulkner.

---

[1] "Prior to the setting of oral argument, the Court shall review the record and briefs and consider *all* errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument. . . ." Tenn. R. Sup. Ct. 12.2.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Mark A. Fulks, Assistant Attorney General; William L. Gibbons, District Attorney General; and Phillip Gerald Harris and Jennifer Nichols, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL BACKGROUND**

At the guilt phase of the trial, the State's proof showed that the defendant, Robert Faulkner, and the victim, Shirley Faulkner, married in September 1998 and separated in December 1998. Faulkner moved in with his grandmother while the victim continued to live at her house in Memphis. On January 18, 1999, the victim filed a complaint with the Memphis Police Department alleging that on the previous night Faulkner struck her with his fist, held an ashtray over her head, and threatened to kill her. According to the victim, who suspected that Faulkner had been high on cocaine, Faulkner also called her several times on the morning of January 18, again threatening to kill her. The officer who took the report testified that the victim was nervous and shaking and that her left temple was swollen. On January 19, the victim visited a physician, who treated her for trauma to the left side of her face. The victim reported to the physician that she had been hit in the face on Sunday, which was January 17.

At approximately 11:00 p.m. on January 21, the victim clocked out from her shift as a cashier at a grocery store. Before leaving, she purchased groceries. Although the victim's supervisor testified that the victim appeared normal when she left, a security guard who escorted the victim to her car described her as shaking and crying. The victim told the guard that she was afraid to go home because her husband might be waiting there. The victim refused the guard's offer to escort her home and left by herself. That same night, the victim's son-in-law, Andre King, decided to check on the victim because a tornado watch was in effect for Memphis. When Mr. King arrived shortly after midnight, he noticed that the lights were on in the victim's house but that no car was in the driveway. Mr. King waited outside for approximately thirty minutes and then left.

The next day, January 22, the victim's friend, Joe Ann Stewart, learned that the victim had not reported for work at her second job as a housekeeper for an apartment complex. Ms. Stewart called the victim's daughter, Twyla King, and asked her to meet Ms. Stewart at the victim's house. Ms. Stewart also contacted the police. Two officers arrived and used Ms. King's key to enter the house, which showed no signs of forced entry. The officers observed bags of groceries in the doorway of the kitchen. The lights were on in the library and the kitchen, and the television was on in the den. However, the victim's bedroom at the back of the house was dark, and the door was closed. When the officers entered the bedroom, they discovered the victim's body which was badly beaten about the head and lying face up on the floor.

Dr. O'Brien Cleary Smith, the Shelby County Medical Examiner, testified that the trauma to the victim was entirely focused on her head. The victim suffered at least thirteen blows to her

head, most of them to her face. She had numerous bruises and tears to the skin and fractures of the facial bones. The injuries produced bruising of the brain, and some of the bone fragments cut into the base of her brain. The victim's facial bones were so fragmented that Dr. Smith could not count the fractures or determine the sequence of the blows. The victim's upper denture plate had been split in half. One piece was found on the floor; the other was still in her mouth. In addition, after inhaling her own blood, the victim's efforts to breathe caused a red frothy foam to obstruct her airway. The victim also swallowed over a pint of blood. Dr. Smith testified that the victim must have been alive, although not necessarily conscious, to have swallowed that amount of blood.

Dr. Smith concluded that the cause of death was blunt trauma to the head. He found no defensive injuries on the victim's body or any evidence that she had tried to escape the beating. Blood stains indicated that her head had moved after the beating began but her arms had not. Based on blood-splatter evidence indicating that the attack occurred while the victim was lying on the floor, Dr. Smith opined that the victim had been stunned or rendered unconscious by an initial blow or blows to the back of the head and may have felt nothing after she was first struck. Because the victim's blood had clotted before the end of the attack, Dr. Smith concluded that the beating had lasted six minutes, the minimum time necessary for clotting.

The crime scene unit of the Memphis Police Department discovered blood in the victim's bedroom, in the foyer next to the bedroom, and in the hallway running the entire length of the house. Blood was smeared on the handles of two grocery bags, in the kitchen doorway, and on the inside and outside knobs of the front door. Officers found a broken handle from a skillet on the bed near the victim's body. The rest of the skillet was never located. The victim's car was also missing and was discovered the day after the murder near the residence of Faulkner's sister. Blood stains were found inside the car.

On Sunday morning, January 24, Faulkner went to the fugitive office of the Shelby County Sheriff's Department and announced that he wanted to turn himself in for killing his wife on Thursday. Faulkner was transferred to Sergeant William Ashton of the Memphis Police Department. According to Sergeant Ashton, Faulkner was "very calm and very rational" during the interview. After informing Faulkner of his Fifth Amendment rights and receiving a written waiver, Sergeant Ashton asked Faulkner if he went by any other names. Faulkner replied, "Yes, Skillet." He then grinned and said, "That's what I hit her with, too." Faulkner stated that the incident occurred around 12:00 to 12:30 a.m. on the night of January 21 and 22. He said that he hit his wife with a frying pan and a metal horseshoe. Faulkner claimed that his wife had called him at lunchtime on January 21 and asked him to meet her at her house that evening. Faulkner described what happened:

> My conversation with my wife was reconciling, and she had on her mind divorce. She said she just wanted the divorce, and I asked her why didn't she just call me on the phone and tell me that. I said, you didn't have to make me walk all the way from Shasta Street in the rain just to tell me you wanted a divorce. I sat back down on the bed and explained to her that I had enough problems already over my

3

head and had to bury my brother on Monday. Everything I've tried to do since being out has just collapsed. I've lost my job, I've lost my wife, I was subject to being sent back to the penitentiary because I can't be without a job for 30 days. And you called me back here to discuss a divorce, and I only came to reconcile and ask we set aside our differences and go to my brother's funeral together. And she responded she was going, but she wasn't going with me.

* * *

So as we were finishing our conversation that was turning into an argument, I proceeded to walk from her bedroom to the front door as I was leaving. She walked behind me and asked me not to come back while I was standing in the hallway and everything just exploded. And I pushed her back off me and grabbed the two items that I seen, and I struck her repeatedly across the head.

Faulkner estimated that he struck his wife between seven and eight times. He acknowledged that the victim fell to the floor after the second blow and that he continued to hit her while she was on the floor. After the attack, Faulkner put the murder weapons in a bag and drove away in the victim's car. He threw the murder weapons and his bloody clothes into a flooded viaduct and then parked the car where it was later found. He slept in empty houses instead of returning to his grandmother's house. Faulkner concluded his statement by professing, "I loved my wife with all my heart. I never meant to take her life. Everything that I had ever tried to do right turned out wrong. Under all the pressure, stress and strain, I made a wrong decision. I only like to say that I'm sorry." Faulkner requested that he be placed on suicide watch in jail.

Faulkner's proof at the guilt phase consisted in part of testimony showing that the security guard who had escorted the victim from the grocery store to her car did not know Faulkner as the guard had claimed and that the guard had been fired for carrying an unauthorized weapon. Evidence was introduced that Faulkner had lost his job on January 3 and that Jimmy Osby, a close friend whom Faulkner called his "brother," had committed suicide on January 21. A Shelby County jailer testified that Faulkner was placed on suicide precaution on January 24.

Based upon the above evidence, the jury convicted Faulkner of first degree premeditated murder. A sentencing hearing was conducted to determine punishment.

At the penalty phase, the State presented proof that in March 1976 Faulkner was convicted of assault with intent to commit first degree murder, assault with intent to commit robbery, and assault with intent to commit voluntary manslaughter. Evidence also showed that Faulkner was convicted of four robberies in September 1984 and second degree murder in October 1984.

4

Paulette Sutton, a forensic serologist and blood-stain expert, testified that based on her analysis of blood-stain patterns, the victim had collapsed fairly quickly but that the attack continued for six minutes. Sutton theorized that the victim's arms had not moved because Faulkner was straddling her during part of the assault, not because she was unconscious.

The final witness for the State was the victim's daughter, Twyla King. Ms. King testified that she had two brothers: Musenda Spencer, age twenty-one, and Jamil Spencer, age seventeen. Musenda was a freshman in college at the time of the murder. Because of the loss of his mother's financial support, Musenda now had to work while attending school. Jamil had "problems" and was incarcerated at the time of the murder. Taking custody of her younger brother affected Ms. King emotionally and financially. Ms. King testified that she and her husband had three daughters. The oldest daughter had been very close to her grandmother, suffered emotionally because of the murder, and was in counseling at the time of the trial. Ms. King concluded by stating that she missed her mother's emotional support.

In mitigation, the defense presented two witnesses. The first witness was Dr. Fred Steinberg, a forensic and clinical psychologist who had interviewed and tested Faulkner for twelve hours. Dr. Steinberg opined that Faulkner was not malingering. Dr. Steinberg testified that Faulkner had experienced a very rough childhood. He was neglected and abused. Both his parents were alcoholics, and one of them abused drugs. Faulkner lived with foster parents at times. Dr. Steinberg testified that Faulkner suffered from chronic substance abuse. According to Dr. Steinberg, on the night of the murder Faulkner's predisposition toward impulsive behavior was made significantly worse by a number of stressors: his attempt to establish himself outside of prison, his difficult relationship with his wife, the loss of his job in early January, his grandmother's hospitalization in early January due to Alzheimer's disease, his friend's suicide the day before the murder, and his frequent use of cocaine. Dr. Steinberg defined "stressor" as a life change that impacts an individual and has an effect upon his psychological and physiological condition. Dr. Steinberg stated that Faulkner had the ability to form intent but that he could not suppress his emotions and that his ability to "cap" his behavior was diminished. Conceding that Faulkner had no mental disease or defect and was sane and competent, Dr. Steinberg diagnosed him as having mixed personality features and exhibiting paranoid thinking typical of cocaine usage. On cross-examination, the State elicited information concerning Faulkner's record of fighting with fellow inmates, possessing weapons, and threatening officers while incarcerated.

The second witness was Patricia McNealy, a counselor at an alcohol and chemical abuse center, who had worked with Faulkner beginning in November 1998 when he tested positive for cocaine while on parole. McNealy testified that Faulkner attended classes twice a week. She had noticed the stress in his life and observed that Faulkner began using cocaine again after losing his job in early January 1999. Around January 20, Faulkner called McNealy to tell her that he would not attend his next group session because his "brother" had committed suicide. Faulkner admitted during the call to McNealy that he had been using cocaine.

5

Based upon this proof, the jury found that the State had proven the statutory aggravating circumstance that the "defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person." Tenn. Code Ann. § 39-13-204(i)(2) (1997).[2] The jury further found that the State had proven beyond a reasonable doubt that the statutory aggravating circumstance outweighed any mitigating circumstances. As a result, the jury sentenced Faulkner to death for the murder of Shirley Faulkner.

## ANALYSIS

### Testimony Regarding "Diminished Capacity"

Faulkner sought to introduce the testimony of Dr. Steinberg and Patricia McNealy during the guilt phase to establish "diminished capacity."[3] At a jury-out hearing, Dr. Steinberg testified that Faulkner had experienced significant, multiple stressors at the time of the offense ranging from loss of job to marital problems. He also suffered from exacerbation of a drug problem. His grandmother was hospitalized. His best friend, whom he felt was like a brother, had committed suicide. All of these stressors occurred within a short period of time. According to Dr. Steinberg, these stressors in combination affected Faulkner's "predisposed tendency to have a short fuse." However, Dr. Steinberg found no indication that Faulkner suffered from a mental disease or defect at the time of the offense. In short, Dr. Steinberg believed that Faulkner was capable of forming intent but that his ability to suppress his emotions was impaired. McNealy would have testified about Faulkner's drug dependency. Defense counsel described her testimony as "dovetailing" with Dr. Steinberg's testimony because she would be relating one of the stressors affecting Faulkner. The trial court ruled that Dr. Steinberg's testimony was inadmissible at the guilt phase under State v. Hall, 958 S.W.2d 679 (Tenn. 1997), because Dr. Steinberg could not testify that Faulkner was incapable of forming intent as a result of a mental disease or defect. The trial court also excluded McNealy's testimony, finding that its admissibility depended on the admissibility of Dr. Steinberg's testimony.

In Hall, the Court held that if general relevancy standards and evidentiary rules are satisfied, "psychiatric evidence that the defendant lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged is admissible under Tennessee law." Id. at 689 (emphasis added). The Court cautioned against referring to such evidence as proof of "diminished capacity." Id. at 690. Instead, such evidence should be presented as relevant to negate the existence of the culpable mental state. The Court distinguished "mental disease or defect" from "emotional state or mental condition":

> [W]e emphasize that the psychiatric testimony must demonstrate that
> the defendant's inability to form the requisite culpable mental state

---

[2] The State also relied on the aggravating circumstance that the murder was especially heinous, atrocious, or cruel in that it involved torture. See Tenn. Code Ann. § 39-13-204(i)(5) (1997). However, the jury did not find this aggravating circumstance.

[3] As discussed above, both Dr. Steinberg and McNealy testified at the sentencing hearing.

was the product of a mental disease or defect, not just a particular emotional state or mental condition. It is the showing of lack of *capacity* to form the requisite culpable mental intent that is central to evaluating the admissibility of expert psychiatric testimony on the issue.

Id. at 690 (emphasis in original).

Dr. Steinberg's testimony was not offered to show that Faulkner lacked the capacity to form the requisite intent because of a mental disease or defect. His proposed testimony, therefore, did not meet the prerequisites of Hall. Accordingly, we conclude that the trial court properly excluded the testimony of both Dr. Steinberg and Patricia McNealy during the guilt phase.

### Instructions Defining "Intentionally" and "Knowingly"

In its instruction on the elements of first degree premeditated murder, the trial court informed the jury that "[a] person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Cf. Tenn. Code Ann. § 39-11-106(a)(18) (1997). Regarding the elements of second degree murder, the trial court instructed the jury that,

> "Knowingly" means that a person acts knowingly with respect to the conduct or to the circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Cf. id. at (a)(20). Relying on State v. Page, 81 S.W.3d 781 (Tenn. Crim. App. 2002), Faulkner argues that the trial court erred by failing to limit the definitions of "intentionally" and "knowingly" to the result-of-conduct language since murder is a crime defined only by its result.

In Page, the fifteen-year-old defendant was indicted for and convicted of second degree murder. The victim was killed as a result of being struck in the head once by the defendant with a baseball bat. The trial court instructed the jury that

> A person acts "knowingly" if that person acts with an awareness:
> (1) that his conduct is of a particular nature; or
> (2) that a particular circumstance exists; or
> (3) that the conduct was reasonably certain to cause the result.

Id. at 786. The Court of Criminal Appeals held that the instruction on the knowing mens rea element of second degree murder, a result-of-conduct offense, erroneously lessened the State's burden of

proof by allowing the jury to convict based only upon awareness of the nature of the conduct or circumstances surrounding the conduct. Id. at 788. The State conceded on appeal that the instruction was erroneous but asserted that the error was harmless. The Court of Criminal Appeals applied a constitutional harmless error analysis and concluded that the error was not harmless beyond a reasonable doubt. The court recognized that mens rea was *the* central disputed issue at trial. Id. at 789-90. Moreover, in closing argument, the State *specifically* and improperly relied upon the defendant's awareness of the nature of the conduct and circumstances surrounding the conduct rather than the defendant's awareness of the result of his conduct. Id. The court noted in dicta that the "intentional" culpable mental state of first degree premeditated murder relates to the result of conduct. As it did for the other homicide offenses, the court suggested a jury charge for first degree premeditated murder, that deviated from the pattern jury instruction by limiting the definition to the result of conduct. Id. at 789 n.2.

The State contends that Faulkner has waived the issue because he did not object at trial and did not raise the issue in his motions for a new trial. An erroneous or inaccurate jury charge, as opposed to an incomplete jury charge, may be raised for the first time in a motion for a new trial and is not waived by the failure to make a contemporaneous objection. See State v. Lynn, 924 S.W.2d 892, 898-99 (Tenn. 1996) (citing Tenn. R. Crim. P. 30(b)). Therefore, contrary to the State's assertion, Faulkner's failure to object at trial does not result in waiver. We conclude, however, that the issue is waived because Faulkner did not raise it in any of his three motions for a new trial. See Tenn. R. App. P. 3(e). The decision in Page was released while Faulkner's case was pending on appeal. The timing of the decision in Page does not relieve Faulkner of the requirement of raising the issue in the motion for a new trial. Cf. Page, 81 S.W.3d at 787-88 n.1 (noting that the issue was raised for the first time in the motion for a new trial).

Because the issue is waived, it may be considered only if plain error exists. Rule 52(b) of the Tennessee Rules of Criminal Procedure provides that "[a]n error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." When deciding whether plain error exists, appellate courts consider five factors:

> (a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached; (c)
> a substantial right of the accused must have been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and (e)
> consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000). The presence of all five factors must be established, and consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. Id. at 283. Moreover, the error must be of such a great magnitude that it probably changed the outcome of the trial. Id.

The State contends that there has been no breach of any clear and unequivocal rule of law, nor has any substantial right of the accused been adversely affected. The law is well-settled in Tennessee "that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury upon proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001). The law requires that all of the elements of each offense be described and defined in connection with that offense. State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989). An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law. State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998).

We have not previously addressed the holding in Page. We agree that a proper instruction defining "knowingly" or "intentionally" does not include the nature-of-conduct and circumstances-surrounding-conduct language because second degree murder and first degree premeditated murder are result-of-conduct offenses. We are not convinced, however, that the inclusion of such language is an error of constitutional dimension when the instruction also includes the correct result-of-conduct definition.

Noting that Tennessee's criminal code is similar to the code adopted in Texas, Page cited Cook v. State, 884 S.W.2d 485 (Tex. Crim. App. 1994), the seminal case in Texas on this issue. Without analyzing the basis for the error, the majority in Cook held that the trial court erred in refusing the defendant's request to limit the definitions of the applicable mental states for the homicide to the result of the defendant's conduct. 884 S.W.2d at 491. The majority in Cook remanded the case for a harmless error determination, citing for guidance cases that do not apply a constitutional harmless error standard. Four members of the en banc court dissented, concluding that the charge, when read as a whole, stated the applicable law in a manner that was not reasonably likely to mislead the jury into convicting the defendant because they thought he engaged in conduct that ultimately caused the victim's death. Id. at 496.

Our research has revealed few decisions from other states concerning this issue. In State v. Rothacher, 901 P.2d 82, 86 (Mont. 1995), the Montana Supreme Court held that an instruction that does not properly narrow the definition of the mental state element to the result of the conduct is "clearly contrary to the plain language in the homicide statute" and therefore erroneous. Finding that the error was harmless beyond a reasonable doubt, the court reasoned:

> The potential prejudice from [the instruction] could occur where a defendant acted purposefully, but intended no harm. However, there were no facts presented in this case from which an argument could be made that when Rothacher struck his victim in the face and kicked him in the head while he was [lying] on the ground, he intended no harm. Therefore, [the instruction] was, at worst, superfluous.

Id. at 87.

9

In State v. Austin, 710 A.2d 732, 739 (Conn. 1998), the Connecticut Supreme Court held that the trial court improperly instructed the jury on the entire definition of the mental state element when only the result-of-conduct definition applied. Applying a non-constitutional harmless error standard, the court found that the error was harmless because 1) the entire charge eliminated any possible risk of confusion, and 2) the factual issues mitigated against the possibility of jury confusion. Regarding the second factor, the court stated:

> The defendant admitted that he pulled the trigger and shot the victim. Counsel for both parties agreed that the sole issue in dispute was the defendant's mental state. Under the circumstances, "[i]t strains reason to believe that the jury could have [understood] the challenged instruction as not requiring that the state prove beyond a reasonable doubt that the defendant intended to kill [the victim]."

Id. (citation omitted).

We have found no authority supporting the conclusion in Page that the erroneous instruction lessened the State's burden of proof. Moreover, the conclusion is inconsistent with Page's application of harmless error analysis. See Sullivan v. Louisiana, 508 U.S. 275, 280 (1993) (holding that an instructional error that lessens the burden of proof is considered structural and not subject to harmless error analysis). The superfluous language in the "knowingly" definition did not lessen the burden of proof because it did not relieve the State of proving beyond a reasonable doubt that the defendant acted knowingly.

Page also described the instructional error as a misstatement of an element. 81 S.W.3d at 789. The misstatement of an element in jury instructions is subject to constitutional harmless error analysis. Pope v. Illinois, 481 U.S. 497, 501-03 (1987). In Page, however, an element was misstated only to the extent that the erroneous instruction defined the entire scope of the mental state element when only the result-of-conduct definition applied. In our view, the inclusion of such surplusage falls short of being a "misstatement of an element," as that term is used in constitutional analysis. Cf. State v. Turner, 675 S.W.2d 199, 205 (Tenn. Crim. App. 1984) (holding that inclusion of surplusage in jury charge defining conspiracy was "plainly harmless").

We recognize that we previously have stated that "a defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). This statement was cited by the Court of Criminal Appeals in Page. 81 S.W.3d at 789. Our statement in Teel, however, was made in the context of the omission of the definition of rape, the underlying felony for the felony murder charge. 793 S.W.2d at 249. The failure to instruct the jury on a material element of an offense is a constitutional error subject to harmless error analysis. See State v. Ducker, 27 S.W.3d 889, 899 (Tenn. 2000). Not every erroneous jury instruction, however, rises to the level of constitutional error. See Miller v. State, 54 S.W.3d 743, 746 (Tenn. 2001) (clarifying that State v. Brown, 836 S.W.2d 530 (Tenn. 1992), "did not declare or imply that the potentially

10

confusing 'premeditation may be formed in an instant' instruction infringed upon a defendant's constitutional rights").

Turning to the present case, we must first determine whether the inclusion of the nature-of-conduct language in the "intentionally" definition is an error of constitutional dimension. As noted above, the trial court instructed the jury in accordance with Tennessee Code Annotated section 39-11-106(a)(18) (1997) that "[a] person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engaged in the conduct or cause the result." First degree premeditated murder requires not only that the killing be "intentional," but also that the defendant act with a "premeditated" mental state. See Tenn. Code Ann. § 39-13-202(a)(1) (1997). The trial court instructed the jury in pertinent part:

> A premeditated act is one done after the exercise of reflection and judgment. <u>Premeditation means that the intent to kill must have been formed prior to the act itself</u>. It's not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time he allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

(Emphasis added); <u>cf. id.</u> at (d).

As the trial court instructed, "the element of premeditation requires a previously formed intent to kill." <u>See</u> <u>State v. West</u>, 844 S.W.2d 144, 147 (Tenn. 1992). The instructions properly defined "intentionally" with regard to the result of the conduct. The entire charge on first degree premeditated murder eliminated any risk of the jury applying the wrong definition. We conclude, therefore, that the instructional error was not constitutional in nature. Furthermore, we find that the error was harmless. The evidence overwhelmingly demonstrated that Faulkner intended the result of his conduct. He had made prior threats to kill the victim and inflicted numerous blows during the commission of the offense. During its closing argument, the State did not rely on the superfluous language in the "intentionally" definition. <u>Cf.</u> <u>Page</u>, 81 S.W.3d at 789 (noting in harmless error analysis that during closing argument the State specifically and improperly relied upon the nature of the conduct and the circumstances surrounding the conduct). In finding that Faulkner acted with premeditation, the jury necessarily found that his conscious objective was to cause the result of his conduct, i.e., the victim's death. The inclusion of the nature-of-conduct language was mere surplusage that did not affect the outcome of the trial. <u>See</u> Tenn. R. Crim. P. 52(a).

Having found that the erroneous instruction defining "intentionally" was harmless, we conclude that Faulkner is not entitled to relief under the plain error doctrine. Moreover, because Faulkner was not convicted of second degree murder, his issue regarding the erroneous instruction defining "knowingly" is moot.

## Verdict Form

Faulkner contends that the sentence of death was imposed in violation of the United States and Tennessee Constitutions because the verdict form did not recite that the jury found the aggravating circumstance "beyond a reasonable doubt." The State argues that this issue is waived because Faulkner did not contemporaneously object to the verdict form and did not include this issue in any of his motions for a new trial.

The jury verdict in this case stated:

> We, the jury, unanimously find the following listed statutory aggravating circumstance or circumstances: the defendant was previously convicted of one or more felonies other than the present charge. The statutory elements of which involve the use of violence to the person. We, the jury, unanimously find that the state has proven beyond a reasonable doubt that the statutory aggravating circumstances so listed above outweighs any mitigating circumstances. Therefore, we, the jury, unanimously find that the punishment for the defendant, Robert Faulkner, shall be death.

Prior to the verdict, the trial court instructed the jury on seven occasions that it was required to consider any statutory aggravating circumstances proven beyond a reasonable doubt. The trial court instructed the jury that the State bears the burden of proving any statutory aggravating circumstances beyond a reasonable doubt. The trial court further instructed the jury that victim impact evidence does not relieve the State of its burden of proving beyond a reasonable doubt the existence of an aggravating circumstance and that the jury may not consider victim impact evidence until it determines that the State has proven one or more statutory aggravating circumstances beyond a reasonable doubt.

The verdict form incorporated the language of Tennessee Code Annotated section 39-13-204(g)(1)(B) (1997), which provides: "We, the jury, unanimously find the following listed statutory aggravating circumstance or circumstances. . . ." The statutory form also omits the burden of proof for establishing aggravating circumstances.

Regardless of waiver, a similar issue was rejected by this Court recently in State v. Davidson, 121 S.W.3d 600, 619-20 (Tenn. 2003). We concluded that such an error can be distinguished from the reversible error in the verdict form in State v. Carter, 988 S.W.2d 145, 152 (Tenn. 1999). See Davidson, 121 S.W.3d at 620. In Carter, the wrong form was used, and the form was not merely silent as to the burden or proof but conflicted with the trial court's instructions regarding the burden. Like Davidson, the language used in the verdict form in the present case was statutorily mandated, and the trial court repeatedly and clearly instructed the jury that it must find any statutory aggravating circumstances beyond a reasonable doubt. We conclude, therefore, that the failure of the verdict

12

form to recite that the jury found the aggravating circumstance "beyond a reasonable doubt" did not render the verdict invalid.

## Mandatory Review

We are bound by statute to review the application of the death penalty to determine whether:

(A) The sentence of death was imposed in any arbitrary fashion;

(B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;

(C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and

(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

Tenn. Code Ann. § 39-13-206(c)(1) (2003). Having thoroughly reviewed the record, we find no indication that the sentence of death was imposed in an arbitrary fashion. We also conclude that the State presented sufficient proof to support the jury's finding that Faulkner had prior convictions for felonies whose statutory elements involve the use of violence to the person. See Tenn. Code Ann. § 39-13-204(i)(2) (1997). We further hold that the evidence supports the jury's finding that the aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt.

Next, we must determine whether the sentence of death in this case is disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. Tenn. Code Ann. § 39-13-206(c)(1)(D) (2003). We are mindful of the following principles applicable to proportionality review:

In conducting a comparative proportionality review, we begin with the presumption that the sentence of death is proportional with the crime of first degree murder. A sentence of death may be found disproportionate if the case being reviewed is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed." A sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which a defendant has received a life sentence. Our inquiry, therefore, does not require a finding that a sentence "less than death was never imposed in a case with similar characteristics." Our duty "is to assure that no aberrant death sentence is affirmed."

13

State v. Hall, 976 S.W.2d 121, 135 (Tenn. 1998) (citations omitted). We have found the following factors helpful in identifying and comparing similar cases: 1) the means and manner of death; 2) the motivation for killing; 3) the place of death; 4) the similarity of the victims and treatment of the victims; 5) the absence or presence of premeditation, provocation, and justification; and 6) the injury to and effects on non-decedent victims. See State v. Bland, 958 S.W.2d 651, 667 (Tenn. 1997). In comparing defendants, we consider the following non-exclusive factors: 1) prior criminal history; 2) age, race, and gender; 3) mental, emotional, and physical condition; 4) role in the murder; 5) cooperation with authorities; 6) remorse; 7) knowledge of helplessness of victim; and 8) capacity for rehabilitation. See id.

The proof in this case showed that Faulkner brutally killed his wife by hitting her in the head and face with a skillet. Four days prior to the murder, he hit her with his fist and threatened to kill her with an ashtray. The next day, he repeated his threat to kill her. On the night of the murder, Faulkner went to his wife's house and attacked her, striking her in the head with the skillet. After two blows, the victim fell to the floor. Faulkner continued to hit her in the head and face with the skillet and a metal horseshoe. In an attack that lasted at least six minutes, Faulkner struck his wife at least thirteen times, completely crushing her face. The victim was alive and breathing during a portion of the attack, although she may have been unconscious after the first few blows. After beating his wife to death, Faulkner took her car. He threw the murder weapons and his bloody clothes into a flooded viaduct. Several days later, Faulkner turned himself in to the police and confessed to the murder.

Faulkner, an African-American male, was forty-three years old at the time of the murder and had a prior criminal history including convictions for second degree murder, assault with intent to commit first degree murder, assault with intent to commit robbery, assault with intent to commit voluntary manslaughter, and robbery. Mitigation testimony showed that Faulkner was subjected to neglect and abuse as a child, that his parents were alcoholics and one used drugs, and that he was placed in foster care. The defense presented expert testimony that, at the time of the murder, Faulkner had a predisposition toward impulsive behavior that was made significantly worse by a number of stressors, ranging from the loss of his job to the suicide of a close friend. The expert testified that Faulkner had the ability to form intent but that once his emotions were aroused under stressful circumstances he could not suppress them and his ability to "cap" his behavior was diminished. There was some evidence that Faulkner was using crack cocaine at or about the time of the murder.

Based upon an exhaustive review of the record and Supreme Court Rule 12 reports, we conclude that the sentence of death imposed in this case is not excessive or disproportionate when compared to the penalty imposed in similar cases. The sentence of death has been upheld in numerous cases in which the victim was the defendant's wife or girlfriend. See, e.g., State v. Suttles, 30 S.W.3d 252 (Tenn. 2000) (defendant stabbed girlfriend in Taco Bell parking lot; (i)(2) and (i)(5) aggravating circumstances); State v. Keough, 18 S.W.3d 175 (Tenn. 2000) (defendant stabbed wife after argument in bar and left her to bleed to death in car; (i)(2) aggravator); State v. Hall, 8 S.W.3d 593 (Tenn. 1999) (after arguing with wife, defendant beat, strangled, and drowned her; (i)(5)

14

aggravator); State v. Hall, 958 S.W.2d 679 (Tenn. 1997) (angry that girlfriend was going to leave him, defendant set fire to her car while she was inside; (i)(5) and (i)(7) (felony murder) aggravators); State v. Smith, 868 S.W.2d 561 (Tenn. 1993) (defendant stabbed, shot and disemboweled wife; (i)(5) and (i)(12) (mass murder) aggravators); State v. Johnson, 743 S.W.2d 154 (Tenn. 1987) (defendant suffocated wife with plastic bag; (i)(2) and (i)(5) aggravators). The sentence of death also has been upheld in numerous cases where the defendant fatally beat the victim in the head. See, e.g., State v. Nichols, 877 S.W.2d 722 (Tenn. 1994) (defendant beat victim in head with a piece of lumber during rape; (i)(2) and (i)(7) aggravators); State v. Cazes, 875 S.W.2d 253 (Tenn. 1994) (defendant beat woman's head to pieces with hammer and also raped her; (i)(2), (i)(5), and (i)(7) aggravators); State v. Barber, 753 S.W.2d 659 (Tenn. 1988) (defendant beat elderly woman in head with crescent wrench during burglary; (i)(5) and (i)(7) aggravators); State v. Porterfield, 746 S.W.2d 441 (Tenn. 1988) (defendant beat man to death by hitting him in head twenty-one times with tire iron; (i)(2), (i)(4), and (i)(5) aggravators); State v. McNish, 727 S.W.2d 490 (Tenn. 1987) (defendant beat elderly woman to death with a vase; (i)(5) aggravator); State v. Harbison, 704 S.W.2d 314 (Tenn. 1986) (defendant killed woman during burglary by striking her on head with a vase; (i)(7) aggravator). In addition to Keough, supra, juries have imposed the death penalty based solely on a finding of aggravating circumstance (i)(2) in several other cases. See, e.g., State v. Odom, 137 S.W.3d 572 (Tenn. 2004); State v. Dellinger, 79 S.W.3d 458 (Tenn. 2002); State v. McKinney, 74 S.W.3d 291 (Tenn. 2002); State v. Chalmers, 28 S.W.3d 913 (Tenn. 2000).

We reiterate that our analysis does not require a determination of whether a given case is subjectively "more or less" like other "death" cases or other "life" cases. Davidson, 121 S.W.3d at 623 (citation omitted). Instead, our review requires that we identify an aberrant death sentence by determining whether the case is plainly lacking in circumstances consistent with those in similar cases in which the death penalty previously was imposed. Id. After reviewing the cases discussed above as well as many others not specifically cited, we are of the opinion that the sentence of death in this case is not excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

## CONCLUSION

In accordance with Tennessee Code Annotated section 39-13-206(c)(1) (2003) and the principles adopted in prior decisions, we have considered the entire record in this case and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the jury's finding of the statutory aggravating circumstance, that the evidence supports the jury's finding that the aggravating circumstance outweighs any mitigating circumstances beyond a reasonable doubt, and that the sentence is not excessive or disproportionate.

We have reviewed all of the issues raised by Faulkner and conclude that they do not warrant relief. With respect to issue of photographic evidence which was raised in this Court but not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals. Relevant portions of that opinion are incorporated herein and are attached as an appendix. Faulkner's conviction and sentence of death are affirmed. The sentence of death shall be carried out as provided

15

by law on the 18th day of August, 2005, unless otherwise ordered by this Court or other proper authority. It appearing that defendant Robert Faulkner is indigent, costs of this appeal are taxed to the State of Tennessee.

_____

JANICE M. HOLDER, JUSTICE