IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 21, 2007

**STATE OF TENNESSEE v. STEVEN ALLEN JONES**

**Direct Appeal from the Criminal Court for Carter County**
**No. S17140      Lynn W. Brown, Presiding Judge**

---

**No. E2006-01952-CCA-R3-CD - Filed December 3, 2007**

---

Following a jury trial Defendant, Steven Allen Jones, was found guilty of first degree murder. The trial court sentenced Defendant to life imprisonment with the possibility of parole. On appeal Defendant argues that (1) the evidence was insufficient to support a conviction of first degree murder and (2) the trial court erred by instructing the jury as to the punishment for first degree murder. After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID G. HAYES and ROBERT W. WEDEMEYER, joined.

Gene Scott, Junior, Johnson City, Tennessee, for the appellant, Steven Allen Jones

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Anthony Clark, District Attorney General; Ken Baldwin, Assistant District Attorney General, for the appellee, the State of Tennessee

**OPINION**

**I. Background**

Defendant's conviction arose out of a domestic altercation between Defendant and the victim, Carla Scott. The altercation occurred in the parking lot of a McDonald's restaurant in Elizabethton on April 12, 2004.

On that date Carla Scott took her two daughters, ages three and one, to McDonald's for an early lunch. There the victim met with Defendant at approximately 10:30 a.m. The victim and Defendant had been involved with each other since 2000, had lived together, and had one child together. The victim also had another child that Defendant treated as his own. The victim ended the relationship on March 19, 2004.

According to Dan Robbins, a patron in the restaurant, Defendant was "hounding" the victim while she was on the telephone. Mr. Robbins testified that the victim told Defendant to "back off" but that Defendant did not do so. Mr. Robbins also testified that Defendant was being "pretty aggressive toward [the victim]" while they were in McDonald's.

Defendant and the victim went outside of the restaurant just before 11:00 a.m. Eugene Young, a McDonald's employee, testified that he was in the parking lot on a smoke break and saw the victim and Defendant arguing in the parking lot near their vehicles. The victim drove a Jeep and Defendant drove a van. Mr. Young testified that the victim ran away from Defendant when he tried to hold her. He said that Defendant took a few steps towards the victim but then turned around and got into his van. Mr. Young testified that he saw the victim wait a few moments and then proceed back to her Jeep and enter on the driver's side. At that point Defendant "stepped out of his van . . . and just fired five shots right through the window, passenger side window of the Jeep." Mr. Young testified it was "two or three minutes" between the time Defendant entered his van and when he got out and shot the victim. After firing five shots into the Jeep, Defendant got back into his van and quickly exited the parking lot.

Tracy Dickens testified that she and two other witnesses, Larry Stout and Jennifer Eisenhower, were eating lunch in Mr. Stout's car in the parking lot of McDonald's about 11:05 a.m. on April 12. Ms. Dickens testified that she saw the victim in the parking lot and then observed an arm come down and a gun. She told her friends, "oh my God, he's going to shoot her." She then heard gun fire. Ms. Eisenhower testified that she saw the victim and stated that the victim was fighting with somebody. On cross-examination, Ms. Eisenhower also testified that about a minute elapsed between the first time she saw the victim and when the victim got into her car. Mr. Stout testified that after he heard gunshots, he saw a man get into the van parked next to the victim's Jeep and drive away quickly. Mr. Stout testified that the van pulled out so quickly that it almost hit Mr. Stout's car.

Officer Michael Peters testified that he was a criminal investigator with the City of Elizabethton Police Department on April 12, 2004, and that he arrived at the McDonald's about ten minutes after the shooting. His job in the investigation was to process the crime scene. He described to the jury what was depicted in numerous photographs from the crime scene. The photos were of the victim's Jeep and the parking lot at McDonald's. The photos showed the broken glass from the shots being fired through the window, the victim's blood on the driver's seat, various shell casings found in and around the Jeep, and bullet holes in the Jeep. Officer Peters also testified that he sent a bullet that was recovered from the victim's body to the Tennessee Bureau of Investigation (TBI).

John Burleson, a paramedic for the Carter County Emergency and Rescue Squad and a reserve deputy sheriff, testified that he was asked by Captain Peters to go to the Bristol Bridge and look for the gun used in the shooting of the victim. Mr. Burleson did not find the gun but he did find two live rounds about four to six inches off the white line on the bridge.

Gilbert Presnell testified that Defendant had worked two days for him. On the Friday before the shooting, Defendant asked Mr. Presnell to borrow a vehicle license plate from Mr. Presnell. Mr. Presnell told Defendant he would need to think about it. On Monday, the day of the shooting, an officer came to see Mr. Presnell and Mr. Presnell told the officer that the license plate was taken from him without permission.

Officer Jason McCall testified that after the Defendant was arrested in White Pine, Tennessee, he searched Defendant's hotel room and van. He testified that he found Defendant's cell phone in the room. Officer McCall further testified that Mr. Presnell's license plate matched the one found on Defendant's van at the time of his arrest.

Ms. Shelly Betts of the Tennessee Bureau of Investigation (TBI), a firearms examiner, testified as an expert witness. Ms. Betts stated that she received five fired cartridge cases from the parking lot at McDonald's, one bullet jacket from the driver's seat of the Jeep, a bullet jacket from the driver's floorboard of the Jeep, one bullet jacket from the victim at the hospital, several bullet fragments from the autopsy, and the unfired rounds that were collected by Mr. Burleson on the Bristol Bridge. Ms. Betts' analysis led her to determine that all five cartridge cases from McDonald's had been fired from the same weapon and the two unfired rounds had once been chambered in and then ejected from the same weapon that fired the five cases found at McDonald's. Ms. Betts further testified that the bullets extracted from the victim's body, those found at the Bristol Bridge, and the cartridge cases were all .9 millimeter caliber.

Wilma Taylor testified that she and the victim were close friends. She was also acquainted with Defendant. She and the victim worked together at Wendy's and also spent time together outside of work. Ms. Taylor testified that she knew Defendant called the victim six or seven times a day to check up on her, and those calls often upset the victim. Ms. Taylor also stated that she asked Defendant about acquiring a handgun and that Defendant said he had one he was thinking about selling. Defendant then showed her a .9 millimeter handgun. Ms. Taylor testified that this was sometime in early 2004.

Missy Clark and her husband, David Clark, were friends with the victim and Defendant and spent time with them on several social occasions. Ms. Clark testified that Defendant took his gun out one evening and showed it to her husband and that she asked him to put it away because she was scared of guns. She also stated that Defendant threatened the life of the victim on "quite a few occasions." She said that he would "just up and say, 'if you ever leave me, I'll f_ing kill you.'" On cross-examination, Ms. Clark testified that the last time she heard Defendant threaten the victim was six or seven months prior to her death. Mr. Clark also testified that the Defendant told him that if the victim ever left him that he would kill her. Mr. Clark further added that the Defendant told him he had a handgun.

The victim's fiancé, Robert Jones, testified that Defendant had threatened to shoot him during the three weeks prior to the victim's death. Mr. Jones also testified that Defendant often told him that "if he couldn't have her [the victim], then no one could." Mr. Jones stated that Defendant

would call him two or three times a day.  The victim called Mr. Jones while she and Defendant were arguing in McDonald's on the morning of her death.  During this call, Mr. Jones testified that he heard the victim say "don't pull that f_ing gun" and Defendant said "I won't."  Mr. Jones hung up the phone and called 911 and told the operator that his fiancé was at McDonald's and there was a man with a gun who was going to hurt her.  After calling 911, Mr. Jones continuously tried to call the victim and she did not answer, so he drove to McDonald's.  When Mr. Jones arrived at McDonald's, the victim was already in the ambulance.  Mr. Jones then called Defendant.  Mr. Jones "asked [Defendant] why he did it, and he said he wanted my bitch ass, and she wouldn't tell him where I [Mr. Jones] was.  So, he shot her . . . and he told me, I hope that bitch dies."

The last witness for the state was Dr. Gretel Stephens.  Dr. Stephens testified that the victim died as a result of two gunshot wounds to the head, with a total of five gunshot wounds.  She concluded the manner of death was homicide.

Defendant testified in his own behalf at trial.  Defendant testified that, on the day of her death, the victim told him to meet her at McDonald's and she would let him see the children.  Defendant testified that he and the victim argued about the children.  When they went outside, he and the victim took the children to the Jeep and each secured one of the children in the appropriate car seat.  Defendant began to get angry at the victim because she was rushing him to say goodbye to the children.  The victim told Defendant that he was never going to see the girls again and that she shoved a picture of Mr. Jones in his face and told him that Mr.  Jones was the girls' new daddy.  Defendant testified that he wadded the picture up and threw it on the floorboard of the Jeep and then the victim slapped him.  Defendant testified that he went to his van, got his gun, and shot the victim.  Defendant admitted on cross-examination that he put the license plate he took from Mr. Presnell on the van he was driving.  Defendant also admitted on cross-examination that he disposed of the gun at the Bristol Bridge and ejected the unfired rounds from the weapon.  Defendant also testified that Mr. Jones called him often and threatened him and that he never threatened Mr. Jones.

James Ford testified for the defense that Defendant told him he was not staying at his home because he was scared of Mr. Jones.  Mr. Ford also testified that he heard Defendant and Mr. Jones "hollering" at each other on the phone about meeting somewhere.  Mr. Ford testified he overheard this conversation sometime during the three weeks before the victim was killed.

## II. Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to support his conviction of first degree murder because the State failed to prove premeditation beyond a reasonable doubt.

At the time of the offense, Tennessee Code Annotated section 39-13-202  provided that

(a) First degree murder is:

    (1) A premeditated and intentional killing of another

* * *

> (d) As used in subdivision (a)(1), "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

In reviewing Defendant's challenge to the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed.2d 560, 573 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced on appeal with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.*; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Great weight is given to the jury verdict in a criminal trial; it accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). "The inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions . . . for the jury." *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)(citation omitted); *see also State v. Gregory*, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993).

The element of premeditation is a question of fact to be determined by the jury. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn.2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Bordis*, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Our Supreme court has delineated several circumstances that may be indicative of premeditation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations of the intent to kill the victim by the defendant, the making of

-5-

preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000).

Defendant argues that he was acting in the heat of passion when he shot the victim. Defendant claims that when the victim showed him the picture of Mr. Jones and stated that this is the children's new daddy and then slapped him, that he responded in the heat of passion and shot her. However, the evidence showed that Defendant had threatened to kill the victim numerous times if she ever left him. Further, Defendant stated this intent to three different people on various occasions. The only evidence contradicting this testimony came from Defendant who declared that everyone else was lying. The evidence further showed, and Defendant admitted, to placing a license plate from someone else's vehicle on his van three days before the shooting. Defendant had time to reflect upon the circumstances when he entered his van prior to again getting out and shooting the victim before she could drive away. Moments after shooting the victim five times, Defendant stated to Mr. Jones that the victim would not tell Defendant Mr. Jones' location, so Defendant shot the victim. Defendant added that he hoped "that [the victim] dies."

Based on our review of the evidence, the jury was well within its prerogative to convict Defendant of first degree murder. After a thorough review of the evidence we find the evidence to be sufficient beyond a reasonable doubt to support a conviction of first degree murder. Accordingly, Defendant is not entitled to relief on this issue.

## III. Jury Instructions

Defendant next argues that the trial court erred in instructing the jury as to the penalties for a first degree murder conviction. The trial judge charged the jury with the following instruction:

> The punishment for this offense is life imprisonment, life imprisonment without the possibility of parole, or death by electrocution. The State, however, is not seeking the death penalty or life imprisonment without the possibility of parole and, therefore, should you return a verdict of guilty, the court will impose a life sentence.

During its deliberations, the jury sent a question to the court asking, "How much time for 2nd degree?" The trial court responded with an oral and written statement informing the jury, "[t]he law does not permit me to inform you regarding the punishment for second degree murder. You should reach a verdict based upon the facts and the law without considering the range of punishment. The range of punishment should not be considered by you at all in deciding this case."

In criminal cases, a defendant has a right to a correct and complete charge of the law. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). "An instruction should be considered erroneous only if the jury charge, when read as a whole, fails to submit the legal issues or misleads the jury as to the applicable law." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005) (citing *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998)). Tennessee Code Annotated § 40-35-201 provides in pertinent part:

(b) In all contested criminal cases, except for capital crimes which are governed by the procedures contained in § § 29-13-204 and 39-13-205, and as necessary to comply with the Constitution of Tennessee, article VI, § 14, and § 40-35-301, the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on possible penalties for the offense charged nor all lesser included offenses.

## A. Jury Instruction Regarding the Inapplicability of the Death Penalty

In *State v. Billy Gene DeBow, Sr.*, No. M1999-02678-CCA-R3-CD, 2000 WL 1137465 at *7 (Tenn. Crim. App., at Nashville, Aug. 2, 2000) *perm. app. denied* (Tenn. March 12, 2001), this Court held that it was proper for a trial court to inform a jury that the state was not seeking the death penalty. This Court held, "By prohibiting the courts from informing juries that death is not an option, the legislature would in essence be creating the same problem it had before: Juries might decide the cases based on the potential punishment rather than the defendant's guilt or innocence of the crime charged." *Id*. at *8 Therefore, in the instant case, the trial court was correct in informing the jury that the death penalty was not a possible penalty facing the defendant.

## B. Jury Instruction Regarding Life Imprisonment Without the Possibility of Parole

This Court also addressed the language of T.C.A. § 40-35-201 in *DeBow*. This Court stated, "the statute provides that the judge and attorneys may not comment on *possible* penalties." *Id*. at *8. In Defendant's case, the State was not seeking life without the possibility of parole; therefore, by instructing the jury that life without the possibility of parole was not an option, the trial court did not violate the statute.

## C. Jury Instruction Regarding Life Imprisonment

*State v. Edward Pinchon*, No. M1999-0094-CCA-R3-CD, 2000 WL 284071 (Tenn. Crim. App., at Nashville, March 17, 2000) *perm. app. denied* (Tenn. May 10, 2004) and *State v. Charles Ray Allen*, No. M1999-00818-CCA-R3-CD, 2000 WL 1649507 (Tenn. Crim. App., at Nashville, Nov. 3, 2000) *perm. app. denied* (Tenn. April 9, 2001), are two cases decided by this Court that address the issue of a trial judge including in the jury instructions all the possible punishments for first degree murder. In *Pinchon*, the trial judge instructed the jury that if the defendant was convicted of first degree murder, he would receive a sentence of life imprisonment with the possibility of parole. *Pinchon*, 2000 WL 284071 at *1. This Court held that when the trial court so errs "the defendant must demonstrate that, but for the erroneous instruction, there is a reasonable probability the jury would have acquitted him of first degree murder and found him guilty of the lesser offense . . ." *Id*. at *4. In *Allen*, the trial court instructed the jury pool at voir dire that the state was not seeking the death penalty or life imprisonment without parole, therefore should the jury find the defendant guilty of first degree murder the "automatic sentence . . . would be an automatic life sentence." *Allen*, 2000 WL 1649507 at *7. The trial court also repeated this in the jury charge. *Id*. at *7. In that case, this Court held that the "trial court's error in instructing the jury about the

penalties for first degree murder does not 'affirmatively appear to have affected the result of the trial on the merits.'" *Id*. at *8.

In the instant case, Defendant contends that because the jury questioned the trial court as to the punishment for second degree murder there is a reasonable probability that the jury would have found the Appellant not guilty of first degree murder absent the improper instruction. Defendant asserts that he has thus shown that, but for the trial court's erroneous instruction, he would have been acquitted of first degree murder and been convicted of the lesser included offense of second degree murder. He bases this argument on the fact that, during its deliberations, the jury sent a written question to the trial judge which states, "what is the maxium [sic] sentence of second degree murder. [sic] That the judge can set. [sic] if any [sic]."

The trial court gave the jury the following response, orally and in writing: "The law does not permit me to inform you regarding the punishment for second degree murder. *You should reach a verdict based upon the facts and the law without considering the range of punishment*. The range of punishment should not be considered by you at all in deciding this case." (emphasis added) The jury had begun its deliberations at 5:40 p.m. The jury sent out the question a few minutes prior to 7:20 p.m. The question was answered and the jury retired to continue deliberations a few minutes later. It was announced that the jury had a verdict at 7:42 p.m. From these proceedings and the chronological order and time periods, Defendant asserts that the jury was "considering second degree murder;" otherwise, Defendant argues, there would have been no reason for the jury "to know the punishment."

If the jury was, as implied by Defendant, making a guilt determination based upon possible punishment, the trial court's answer to the question clearly stated the jury could not do such. A jury is presumed to follow the trial court's instructions. *See State v. Smith*, 893 S.W.2d 908, 914 (Tenn.1994). With the trial court's answer to the jury's question, and the overwhelming proof of first degree murder, we conclude that error, if any, was harmless.

Defendant's final argument is that the trial court's instruction as to the punishment for first degree murder and failure to charge the punishment for second degree murder violated his right to a trial by jury under the Sixth Amendment to the United States constitution and Article I, Section VI of the Tennessee constitution. Defendant does concede that not all erroneous jury instructions rise to the level of constitutional error. *State v. Faulkner*, 154 S.W.3d 48, 60 (Tenn. 2005). Although Defendant has couched his argument as a constitutional violation of the right to a trial by jury, it is essentially a request for this Court to overrule *Allen* and *Pinchon* to the extent that we held that jury instruction errors regarding punishment are not constitutional errors. We do not feel compelled to re-examine *Allen* and *Pinchon*. Accordingly, Defendant is not entitled to relief on this issue.

The State contends in its brief that Defendant waived his right to object to the jury instruction at issue because it was not raised at trial and therefore this Court should review Defendant's claims only under plain error analysis. Tennessee Rules of Criminal Procedure 30(b) addresses the State's

argument and states in pertinent part, ". . . Counsel's failure to object does not prejudice the right of a party to assign the basis of the objection as error in a motion for new trial." Defendant properly raised the objection in his motion for new trial, and therefore, the issue was not waived, and was thus available for plenary appellate review.

## CONCLUSION

After a thorough review of the record, we affirm the judgment of the trial court.


_____
THOMAS T. WOODALL, JUDGE