IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 5, 2005

**SHANNON WADE JACOBS v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Giles County**
**No. 11247      Stella Hargrove, Judge**

———————————

**No. M2004-00966-CCA-R3-PC - Filed August 29, 2005**

———————————

The petitioner, Shannon Wade Jacobs, filed a petition for post-conviction relief from his 2000 jury conviction of second degree murder in the Giles County Circuit Court, for which he received a sentence of 23 years in the Department of Correction.   After the post-conviction court appointed counsel for the petitioner and conducted an evidentiary hearing, the court dismissed the petition. The petitioner appeals.  Upon our review, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which DAVID H. WELLES and J.C. MCLIN, JJ., joined.

William J. Eledge, Lawrenceburg, Tennessee, for the Appellant, Shannon Wade Jacobs.

Paul G. Summers, Attorney General & Reporter; Elizabeth B. Marney, Assistant Attorney General; T. Michel Bottoms, District Attorney General; and Patrick Butler, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

On the petitioner's direct appeal from his conviction, this court summarized the facts underlying the conviction:

Defendant Shannon Wade Jacobs was charged with the January 9, 2000, [first degree] murder of Andre Demetrius Martin in Pulaski, Tennessee.  Officer L.C. Gill, a patrolman with the Pulaski Police Department, testified that on the night of January 9, 2000, he responded to a call that shots had been fired on North Third Street.  He stated that he was the first to arrive on the scene and found the victim lying beside the road and facing the roadway.  The victim was struggling to breathe and was unable to communicate.  He stated that

he assured the victim that an ambulance was on the way. He testified that near the victim lay a small bag containing what appeared to be crack cocaine residue. He testified that after leaving the scene, he arrived at the hospital where he met his supervising officer, Lieutenant John Dickey, who instructed him to search for the vehicle believed to be driven by the suspect.

Patrolman Dwight Garner, a patrolman with the Pulaski Police Department, testified that he also answered the call of a possible shooting on North Third Street. He testified that upon his arrival, Patrolman Gill turned over a Ziplock bag containing drug residue. He stated that he secured the evidence and later turned it over to Investigator Vickie Maddox. He stated that he also recovered a spent .308 cartridge from the area. He stated that he later patrolled the city looking for a light blue, four-door Ford Tempo with the driver's window missing, which was believed to be the car driven by the suspect.

Dr. Charles Harlan, a forensic pathologist for the State of Tennessee and the assistant county medical examiner for Giles County, testified that the victim died as a result of a gunshot wound to the chest.

Robert Larry Allen testified that he was sitting in his vehicle on North Third Street talking with the victim when a car pulled up beside them. He stated that the victim started to walk over to the driver's side of the car, at which point a gun was fired. The glass shattered and the victim went flying across the road. He stated that the victim stood to his feet and fell down again. The car, a blue Ford Tempo, remained for about thirty to forty-five seconds before leaving. Allen testified that he knew defendant, and defendant was sitting in the passenger's side of the car. He also testified that he saw the rifle and saw it go off.

Cheryl Radtke testified that she had been staying at a trailer park with boyfriend Scotty Campbell, and she and Campbell were in the process of moving in with Donna Frost and defendant. Defendant was Frost's boyfriend at the time. The day of the shooting, Radtke, Frost, Campbell, and defendant went to Lawrenceburg to get a stove from Frost's mother's house and then proceeded to Frost's sister's house to get a deep freezer. She then stated that they moved the appliances out to defendant's house, after which time they took Frost to work at Pulaski Web. Radtke testified that she, Frost's two

children, Campbell, Michael "PeeWee" Bryant, and defendant went to the trailer park so Campbell could get some clothes from his mother's house. She stated that at this point, Campbell was driving Frost's light blue Ford Tempo. At the trailer park, defendant left the others for a little while, then returned with Bryant, and told the others that they were going to North Third Street to purchase some crack cocaine. Radtke stated that while driving up North Third Street, they encountered the victim who sold crack cocaine to either Bryant or defendant. Radtke stated that she did not know if the victim gave the drugs to Bryant or defendant, but she did see defendant with the money before he gave it to Bryant. She said that defendant laid the drugs on the dash of the car. Bryant was then taken home, and Radtke and defendant returned to defendant's residence. Defendant subsequently realized that the drugs were fake. At that point, Frost called and stated that she was finished with work and needed to be picked up. Radtke began to leave to pick up Frost, at which point defendant told her he was going to ride into town with her. She stated that she was driving, defendant was in the passenger's seat, and defendant had a .270 caliber deer rifle in the car. The testimony from three separate witnesses indicates that defendant kept the deer rifle with him most of the time. Radtke stated that on the way into town, defendant was saying, "I'm going to kill me a n---er. I'm going to kill me a n---er."

Radtke stated that defendant instructed her to drive down North Third Street. Instead, she drove past North Third Street and told defendant she was going to pick up Frost, at which point defendant told her, "No, you're not. Turn this car around. Turn it around now." Radtke turned around, went back, and again, did not stop. She said defendant told her to turn the car around and had his hand on the gun the whole time. They went to North Third Street a total of three times, and every time defendant kept saying, "I'm gonna kill me a n---er. I'm gonna kill me a n---er."

The two eventually saw the victim leaning over a truck and talking to someone. The victim flagged them down, and Radtke stopped the car. The gun was lying across her lap at this time. She said the last time they turned around, defendant put the gun in her lap with the barrel pointing to the driver's side door. The victim began walking towards the car, and defendant instructed Radtke to roll down the window. She stated she tried to roll down the window, but it would not roll down by itself so she had to push it down. She told defendant to wait because he had the gun up, ready to shoot. Before

she could open a window, defendant shot through the window. Up to this point, the victim was saying, "No, man, no." She stated that after they drove off, defendant said, "See, I told you I was gonna shoot me a n---er."

Radtke stated that, when they picked up Frost from work, Frost wanted to know what had happened to the window, and defendant responded that he had just killed a "n---er." Frost asked why, and defendant said it was over $40.00 worth of powder cocaine. Defendant told Frost it was powder cocaine because Frost did not want defendant to be using crack cocaine. She stated that defendant told them that if they ever said anything about what happened, he would kill them all. Radtke testified that when defendant went to bed that night, Radtke called a friend and asked him to come pick her up. The friend arrived and took Radtke and Campbell back to town.

Finally, Radtke testified that, for her involvement in this matter, she was originally charged with criminal responsibility for facilitation of a felony, a Class A felony. However, she pled guilty to conspiracy to possess a Schedule II drug, a Class C felony, with a sentence of three to six years.

Investigator John Dickey testified that, at approximately 5:00 a.m. the next morning, Officer David McVeigh stopped Frost as she was driving her blue Ford Tempo. Frost and her car were then taken to the Pulaski Police Department, where she gave a statement to the police. Subsequently, the police obtained a search warrant for defendant's residence. Defendant was not there upon arrival but was later arrested in Lewisburg and transported back to the Giles County Sheriff's Office.

Upon executing a search warrant, the officers found several .270 cartridges, but no high-powered rifles. The following morning, defendant gave a statement to Investigator Dickey and also signed a written waiver of his Miranda rights. He told Investigator Dickey about the events that occurred the night before and that he had the gun in his hands when the gun went off. He also told Investigator Dickey where the gun could be located. Subsequently, Investigator Dickey returned to defendant's residence and found the rifle. He testified that no fingerprints were taken from the weapon to ascertain whether defendant's prints, or any other prints, were on the weapon.

Scotty Campbell testified that at the time of the murder, he was living with Radtke, defendant, and Frost, along with Frost's two children. At the time, he and Radtke were dating, and Frost and defendant were friends. He stated that on January 9, they made plans to go to Lawrenceburg to get a refrigerator and stove for the house. They went to Lawrenceburg in Frost's blue Ford Tempo and then returned home. Subsequently, they took Frost to work. Campbell, Radtke, and defendant then went to Campbell's mother's home to get some clothes. While they were there, defendant exited the car and began looking for some crack cocaine. Campbell knew this because defendant told him that defendant had gone to Larry Allen's to look for some crack cocaine. Campbell and defendant then went to Allen's house. Defendant and Allen went to a back room and stayed for about five minutes. Campbell said that when they exited the back room, Bryant entered the house and, upon returning to the car, defendant and Bryant were talking in the middle of the road. At this point, defendant told Campbell that they were going over to the "bad side of town" because Bryant knew where they could get some crack cocaine.

Campbell stated he did not want to go, but defendant told him he had no[] choice but to get in the car and take him and Bryant over there. Campbell was driving the car, defendant was in the middle of the front seat, and Bryant was in the front passenger seat directing Campbell where to drive. Upon arriving at some apartments, Bryant exited the car and went to an apartment for ten or fifteen minutes. Campbell stated that Bryant returned and said that they did not have any. He also went to a different home, but no one was there. Campbell stated that defendant stayed in the car but had given money to Bryant. Campbell said they then returned to the first house and waited for someone he thought was the victim. He said that the victim came up to the car, showed them what he had, dropped it into Bryant's hand, and Bryant gave the victim the money. Defendant then told Bryant he wanted to see his "shit," and Campbell said Bryant gave it to defendant and told him that he wanted his piece for getting it. At this point, defendant gave Bryant a piece, and they left the area, dropping off Bryant.

After dropping Bryant off, Campbell, Radtke, defendant, and the two children were left in the car. They then returned home. On arrival, Frost called and stated that she was ready to be picked up from work. At this point, defendant had gone upstairs, and Campbell and Radtke were cooking dinner. Campbell stated that Radtke left to

go pick up Frost from work. He stated that, as Radtke began to leave, defendant came downstairs. Defendant was upset because the crack cocaine was fake and showed them that it was actually peanuts.

Campbell stated that defendant told him to watch the kids because defendant was going to ride into town with Radtke to pick up Frost. Campbell said it was about an hour to an hour-and-a-half before they returned. He said when they pulled up, he saw Frost sweeping glass out of the front seat of her car. Defendant was smiling and saying, "I got him. I got him." Campbell did not know who defendant was talking about, and upon questioning defendant, defendant said, "I killed me a n---er. I killed me a n---er." Campbell said defendant brought his gun into the house, and Campbell recognized it as the gun defendant carried with him all of the time. Campbell said that Radtke also said, "He's not playing, Scotty. He done it."

Donna Frost testified that at the time of the victim's death, she was living with defendant and drove a blue 1992 Ford Tempo. She stated that Radtke and defendant came to pick her up when she got off of work on January 9. Radtke was driving, and defendant was in the passenger's seat. Frost got into the back seat and noticed that the driver's side window was gone. She asked what happened, and Radtke responded, "Shannon just shot a n---er." Defendant then turned around and said, "Yeah, and if anybody snitches on me, I'll shoot them too. It don't make me no difference." Frost said that defendant told her that if she tried to leave, defendant would shoot every tire out from under the car.

Defendant testified that the shooting was an accident. He did not mean to shoot the victim. He stated that he and Radtke both had their hands on the gun at the time of the shooting and that the victim was reaching through the car door. He also said that he was intoxicated. Defendant further stated that he had taken cocaine after the shooting and before he was arrested and made the statement.

*State v. Shannon Wade Jacobs*, No. M2001-00349-CCA-R3-CD, slip op. at 2-5 (Tenn. Crim. App., Nashville, July 5, 2002), *perm. app. denied* (Tenn. 2003).

In the post-conviction evidentiary hearing, trial counsel testified that his appointment to represent the petitioner marked his first involvement in a criminal jury trial. Counsel informally asked the trial judge whether counsel should handle the case in light of his inexperience, but the

judge asked him to remain in the case. Counsel testified that "at that point in time, I probably was not competent to handle [the petitioner's] case[, b]ut by the time [o]f the trial, I was."

Counsel testified that he began work on the case immediately. He conferred with the petitioner's preliminary hearing counsel and with co-defendant Radtke's counsel. For purposes of strategy, he conferred with an attorney experienced in criminal law who had no involvement in the case. He opined that he considered the petitioner's second degree murder verdict to be a "win" for the defense.

Counsel testified that three state witnesses quoted the petitioner's reference to the victim as a "n - - - - -." Counsel acknowledged that the petitioner is Caucasian and that the victim was African American. Based upon discovery, counsel knew before the trial that the witnesses would attribute these racial epithets to the petitioner. Counsel testified that he was aware of a history of racial issues in Pulaski, but he did not "consider Pulaski to have a racial problem." He acknowledged, however, that the attribution of racial epithets to the defendant was "not good for the defense." Counsel was aware before trial that the petitioner had African American relatives by marriage, but he did not call any of these relatives as witnesses in an effort to abate any racial overtones.

Counsel testified that he met with the petitioner extensively. Their first meeting lasted four hours. Counsel testified that he filed numerous motions, including a motion to suppress the petitioner's pretrial statement and a motion for a psychological examination, the latter of which was granted. Counsel's attorney-fee itemization reflected that he had spent 116 hours on the petitioner's case.

Counsel opined there was no need for an expert witness to analyze the physical evidence because the defendant had admitted shooting the victim, and only one shot was fired. Counsel also saw no need for an expert on the basis that a spent shell was found on the street that did not match the petitioner's rifle. He testified, "[I]f my client is saying he shot [the victim], I am not going to hire an expert for a shell casing found on the street that is the predominate street for drugs in Giles County. . . . There is probably a shooting up there once a night." Counsel attributed a seven-inch drop in the trajectory of the bullet through the victim's body to the probability that the victim was stooping at the time he was shot. Counsel essentially opined that the bullet's downward trajectory through the victim's body supported the defense theory that the victim, Radtke, and the petitioner struggled over the rifle when it discharged.

Counsel testified that when he learned that the police had retrieved and handled the rifle without gloves and had performed no fingerprint tests, he declined to seek fingerprint tests because of the possibility that tests would reveal no prints of the victim or of Radtke, which would have resulted in "my client looking at a first degree murder. So that is – [t]hat is strategy." Counsel thought the defense could be better advanced by cross-examining the officers about their failure to test the weapon for fingerprints.

Counsel testified that the trial court instructed the jury on the lesser included offenses of second degree murder, voluntary manslaughter, and criminally negligent homicide. He opined that reckless homicide should have been instructed.

Counsel acknowledged that the jury instructions on the meaning of "knowing" were identical to the instructions held to be error in *State v. Page*, 81 S.W.3d 781 (Tenn. Crim. App. 2002). Counsel explained that *Page* was filed after the petitioner's trial but that he moved the Court of Criminal Appeals for a rehearing based upon the holding in *Page*. The motion was denied.

Counsel testified that because the petitioner had given a pretrial statement in which he admitted shooting the victim, the theory of the defense was to negate premeditation as a means of averting a conviction of first degree murder. He testified, "[T]he strategy was to make it look like a struggle over the gun and my client being so messed up plus the testimony from the state[']s own witness that the gun has a hair trigger." Counsel stated that he opted to utilize voluntary intoxication as a means of negating premeditation, adding that "the chances of acquittal in this case were virtually zero."

Counsel acknowledged that he moved for a mistrial after "members of the sequestered jury were allowed to leave the presence of sworn deputies." The trial court overruled the motion, and counsel elected not to raise the issue on appeal.

Counsel further acknowledged that, on occasion during trial when the court reporter could not hear or understand certain testimony, the reporter would ask a witness to repeat the testimony. Counsel testified that this circumstance was the result of poor acoustics in the courtroom. Counsel opined that the repeated testimony was "[m]ostly beneficial to the state." Counsel moved for a mistrial based upon the repetition of testimony, but the trial court overruled the motion.

Counsel testified that the trial court also overruled his motion to conduct individualized voir dire during the jury selection process.

The petitioner testified in the evidentiary hearing that generally trial counsel "didn't get up there and argue nothing for me or nothing. I mean, he really didn't know what was going on." He claimed that the trial judge consistently ruled in favor of the prosecution on issues that came up during trial and that the state "got to do what they wanted to do. And they done it." The petitioner did testify specifically that trial counsel had to implore the trial court for help in the jury selection procedure.

The petitioner testified that the bullet trajectory and the relative sizes of the entry and exit wounds belied that he shot the victim. He claimed that counsel never discussed these aspects of the evidence with him and that he "never got to see none of this until after [he] was in the penitentiary." He testified that counsel never explained the lesser included offenses to him.

On cross-examination, the petitioner admitted, "I didn't have life without [the possibility of parole]. I got away with second degree murder." He further acknowledged that counsel filed "a lot of motions."

He acknowledged that he testified at trial that he shot the victim "because [he] never seen none of the evidence or nothing . . . until I went to the penitentiary." He testified that counsel told him before trial that the strategy would be to "shoot for manslaughter."

The post-conviction court entered an extensive order that contained its findings and its adjudication of the case. The court held that the petitioner's claims of trial errors, including the failure to instruct the jury on the lesser included offense of reckless homicide, the separation of the sequestered jurors, the instances of repeated prosecution testimony, and the denial of individual jury voir dire, were waived because the petitioner failed to raise such issues at trial and on direct appeal. The post-conviction court also rejected various claims of ineffective assistance of counsel. The court found that, although trial counsel at the time of his appointment in the case was inexperienced in defending a first degree murder case, he prepared well and handled all pretrial phases and trial activities competently and effectively. The court held that trial counsel's decision to disdain rebuttal evidence as a means of minimizing the damage caused by evidence of the petitioner's use of racial epithets was a reasonable tactical decision. The post-conviction court determined that, based upon trial counsel's testimony, counsel had adequately prepared for the case and had spent significant time meeting with and advising the petitioner. The court likewise rejected the claim that trial counsel failed to seek instructions on lesser included offenses, noting that counsel succeeded in obtaining an instruction on voluntary intoxication and in defeating a charge of first degree murder. The court noted that the trial court charged all lesser included offenses "down to criminally negligent homicide." The court discerned no merit in the petitioner's claim that trial counsel was ineffective in failing to present expert testimony about the manner in which the victim was shot; the court found that the evidence of the petitioner's firing the single gunshot that killed the victim was straightforward and not amenable to meaningful contradiction. Finally, the post-conviction court found that trial counsel "spent considerable hours investigating the physical evidence in this case" and held that counsel did not deficiently perform in investigating the physical evidence.

The petitioner filed a timely notice of appeal from the court's denial of post-conviction relief.

In post-conviction proceedings, the petitioner has the burden of proving by clear and convincing evidence the claims raised. Tenn. Code Ann. § 40-30-110(f) (2003). On appeal, the lower court's findings of fact are reviewed *de novo* with a presumption of correctness that may only be overcome if the evidence preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997).

On appeal, the petitioner first claims that the post-conviction court erred in rejecting his claims of the ineffective assistance of trial counsel.

When a petitioner challenges the effective assistance of counsel, he has the burden of establishing (1) deficient representation and (2) prejudice resulting from that deficiency. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 2064 (1984); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Deficient representation occurs when counsel's services fall below the range of competence demanded of attorneys in criminal cases. *Bankston v. State*, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991). Prejudice is the reasonable likelihood that, but for deficient representation, the outcome of the proceedings would have been different. *Overton v. State*, 874 S.W.2d 6, 11 (Tenn. 1994). On review, there is a strong presumption of satisfactory representation. *Barr v. State*, 910 S.W.2d 462, 464 (Tenn. Crim. App. 1995). If prejudice is absent, there is no need to examine allegations of deficient performance. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

In evaluating counsel's performance, this court does not examine every allegedly deficient act or omission in isolation, but rather we view the performance in the context of the case as a whole. *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The primary concern of the court should be the fundamental fairness of the proceeding of which the result is being challenged. *Id.* Therefore, this court should not second-guess tactical and strategic decisions by defense counsel. *Henley*, 960 S.W.2d at 579. Instead, this court must reconstruct the circumstances of counsel's challenged conduct and evaluate the conduct from counsel's perspective at the time. *Id.*; *see also Irick v. State*, 973 S.W.2d 643, 652 (Tenn. Crim. App. 1998).

We agree with the post-conviction court that the petitioner failed to sustain his claims of ineffective assistance of counsel by clear and convincing evidence. Our review of the record reveals that counsel proved himself to be more than competent in the preparation and trial of the petitioner's case. His strategic and tactical choices were reasonable and based upon informed legal and practical judgment. Obviously, if inexperience alone were a sufficient basis for establishing ineffective assistance of counsel, no attorney would ever gain experience in defending criminal cases. For this reason, our law requires that the convicted defendant who collaterally attacks his conviction on the grounds of ineffective assistance of counsel must prove an instance or instances of counsel's deficient performance.

The petitioner has failed to do this on any claim except, arguably, on his claim that counsel failed to seek an instruction on the lesser included offense of reckless homicide. *See* Tenn. Code Ann. § 39-13-215 (2003) ("Reckless homicide is a reckless killing of another" and is a Class D felony.). "Reckless" refers

> to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

*Id.* § 39-11-106(31).

The petitioner in the present case testified at trial that the shooting was accidental, and a state forensic expert agreed that the rifle had a "hair" trigger.

In the present case, trial counsel did not request an instruction on reckless homicide. At the time of trial, it was the duty of the trial judge to instruct the jury on all applicable lesser included offenses "without any request on the part of the defendant to do so." *See* Tenn. Code Ann. § 40-18-110(a) (1990) (amended 2001 Pub. Acts ch. 338, § 2). Accordingly, the trial court was obliged to instruct the jury as to the lesser included offense of reckless homicide. *State v. Jerry W. Jordan*, No. M1999-00813-CCA-R3-CD, slip op. at 8, 10 (Tenn. Crim. App., Nashville, Oct. 11, 2001) (reckless homicide is a lesser included offense of first degree murder; trial court erred in failing to instruct on reckless homicide when evidence showed a basis for jury concluding that the killing was reckless).

Although the trial court erred in failing to instruct the jury on reckless homicide, the issue presented by the petitioner is whether trial counsel was ineffective in failing to request an instruction on this lesser included offense.

We see the possibility of deficient performance in this failure because one might infer from the circumstances that the omission of the instruction was inadvertent and that had counsel requested the instruction, the trial court would have given it. Tennessee Code Annotated section 39-13-215 proscribing reckless homicide, a Class D felony, was added to the 1989 code in 1993. *See* Tenn. Code Ann. § 39-13-215 (2003) (resulting from 1993 Pub. Acts ch. 306, § 2). The section's adhesion to the code part dealing with homicides apparently accounts for the appearance of the reckless homicide proscription three sections following the proscription of criminally negligent homicide, which as a Class E felony is a lesser offense than reckless homicide. *See id.* § 39-13-212 (2003). A section proscribing vehicular homicide, *see id.* § 39-13-213, and a section declaring that a viable fetus is a person for purposes of defining a victim of a homicide, *see id.* § 39-13-214, appear between the proscription of criminally negligent homicide and the greater offense of reckless homicide. Thus, with respect to these latter two offenses, not only do they appear out of the customary descending order of severity, but also they do not appear sequentially. The possibility arises, therefore, that this codification anomaly contributed to the absence of a reckless homicide instruction. We note in passing that the post-conviction judge mis-spoke when she said, "The jury was charged *all the way down to criminally negligent homicide*." (Emphasis added.) In charging "down" and reaching criminally negligent homicide, the trial court, perhaps inadvertently, omitted the instruction on reckless homicide.

That said, we cannot conclude that the petitioner has established prejudice. The petitioner was obliged to prove by clear and convincing evidence a reasonable probability that the outcome of the trial proceeding would have been different had the instruction been given. *See Stickland*, 466 U.S. at 694, 104 S. Ct. at 2068. A court reviewing a claim of ineffective assistance of counsel should not order a new trial unless the court is reasonably sure that the error *did affect* the

verdict. *See id.*; *see also Overton*, 874 S.W.2d at 11 ("To establish actual prejudice, the defendant must demonstrate that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"), *cf. State v. Allen*, 69 S.W.3d 181, 189 (Tenn. 2002) (articulating a traditional test for harmless constitutional error in omitting jury instruction on lesser included offense and indicating that the conviction will be reversed unless the reviewing court is reasonably sure that the error *did not* affect the verdict).

The proof at trial demonstrated that the petitioner had a motive to shoot the victim, he stated that he intended to kill the victim on multiple occasions, he procured the deer rifle, he demanded that Ms. Radtke drive to the victim's location, and he bragged to numerous individuals after the shooting that he had killed the victim. In the face of this evidence, we are unconvinced in this collateral attack proceeding that the verdict would have been different had trial counsel persuaded the trial judge to charge reckless homicide as a lesser included offense of first degree murder.

In the petitioner's next issue, he claims that the trial court's determination of his sentence violated his right to trial by jury based upon *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004). We need not fathom the nuances of waiver or forfeiture that may be implicated by the petitioner's failure to raise the issue before now; our supreme court has determined that Tennessee's judge-sentencing scheme does not run afoul of the constitutional right to jury trial and is compliant with the dictates of *Blakely*. *See State v. Gomez*, 163 S.W.3d 632 (Tenn. 2005), *reh'g denied* (May 18, 2005).

Finally, the petitioner claims that the trial court erred in presenting to the jury definitions of culpable mental states that run afoul of *State v. Page*, 81 S.W.3d 781 (Tenn. Crim. App. 2002). In *Page*, this court reversed a conviction of second degree murder, a result-of-conduct crime, because the trial court instructed the jury that a person acts knowingly if the person acts with merely an awareness that his conduct is of a particular nature or that particular circumstances exist rather than instructing that the person acts knowingly, for purposes of a result-of-conduct crime, only when the person is aware that the conduct is reasonably certain to cause the result. *Id.* at 788. The trial court in the petitioner's case utilized the same instruction as that condemned in *Page*.

That said, we refer to *State v. Faulkner*, 154 S.W.3d 48 (Tenn. 2005). In *Faulkner*, the high court held that Faulkner waived the *Page* issue by failing to raise it in his motion for new trial. *Id.* at 58. The court said, "The decision in *Page* was released while Faulkner's case was pending on appeal. The timing of the decision in *Page* does not relieve Faulkner of the requirement of raising the issue in the motion for new trial." *Id.* Likewise, in the present case, *Page* was filed while the petitioner's case was pending appeal, and the petitioner did not include the issue in his motion for new trial. This determination via *Faulkner* that the petitioner waived the *Page* issue for purposes of direct appeal leads us to conclude that it has been waived for purposes of post-conviction relief, as well. *See* Tenn. Code Ann. § 40-30-106(g) (2003) (ground for post-conviction relief is waived "if the petitioner personally or through an attorney failed to present it for determination in

any proceeding before a court of competent jurisdiction in which the ground could have been presented," subject to inapplicable exceptions).[1]

Having reviewed the petitioner's appellate claims and discerning no basis for reversal, we affirm the denial of post-conviction relief.

_____
JAMES CURWOOD WITT, JR., JUDGE

---

[1] As an aside, we note that in performing a plain error analysis, the *Faulkner* court said, "We are not convinced, however, that the inclusion of . . . language [inapt per *Page*] is an error of constitutional dimension when the instruction also includes the correct result-of-conduct definition." 154 S.W.3d at 58-59. More pointedly, the *Faulkner* court said, "The superfluous language in the 'knowingly' definition did not lessen the burden of proof because it did not relieve the State of proving beyond a reasonable doubt that the defendant acted knowingly." *Id.* at 59.