# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### April 11, 2006 Session

## TERRY JAMAR NORRIS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-27229     John P. Colton, Jr., Judge**

---

**No. W2005-01502-CCA-R3-PC  - Filed July 26, 2006**

---

The petitioner, Terry Jamar Norris, appeals the dismissal of his petition for post-conviction relief, arguing ineffective assistance of appellate counsel. Following our review, we affirm the dismissal of the petition for post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J.C. MCLIN, JJ., joined.

James E. Thomas, Memphis, Tennessee, for the appellant, Terry Jamar Norris.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Jack Irvine, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

In June 1999, the petitioner was convicted by a Shelby County jury of second degree murder. The facts in this matter were set out in the direct appeal:

> On March 10, 1997, nineteen-year-old victim Keith Milem was found shot to death outside the home where he lived with his uncle. On the evening of March 11, 1997, the [petitioner] was taken into custody by police and questioned about the crime. On March 13, 1997, the [petitioner] confessed to shooting the victim. The [petitioner] informed police of the location of the murder weapon, a nine-millimeter semiautomatic pistol, and police recovered the gun and submitted it for testing. Results of tests performed on the gun indicated that the fatal shots had indeed been fired from the [petitioner's] gun.

At trial, Lakendra Lavonne Mull testified that she and the [petitioner] were roommates at the time of the crime, and she reported that at that time, the [petitioner] was dating her cousin, Lateeska Newberry. Mull explained that the victim was also her distant cousin, and she stated that Newberry and the victim had known one another since attending elementary school together. Mull characterized the victim and Newberry as her "best friends."

Mull testified that on March 10, 1997, the victim, Newberry, and a third friend named Tim visited her apartment during the afternoon. Mull stated that the [petitioner] was present at their apartment when the victim initially arrived, and she reported that the [petitioner] spoke to the victim briefly upon the victim's arrival. Approximately two hours after the victim arrived at the apartment, the [petitioner] left and later returned with his brother. At the time the [petitioner] returned, the victim, Newberry, Tim and Mull were engaged in conversation, and the victim and Tim were drinking alcoholic beverages. Mull testified that the [petitioner] and his brother stayed only ten minutes upon their return to the apartment before departing a second time. Mull testified that the [petitioner] subsequently telephoned her to tell her that he had left his gun at the apartment, and he soon returned to pick up the gun. Mull explained that her young daughter lived with them, and the [petitioner] generally did not leave the gun in the apartment with Mull's daughter. After picking up the gun, the [petitioner] left for a final time.

Mull recalled that approximately three hours after the [petitioner] picked up his gun, she drove the victim home. Mull testified that the victim was "kind of staggering because he had been drinking." However, she maintained that the victim "probably was more sleepy than full of alcohol" because he had not drunk "all that much" while at her apartment. Mull recalled that when she left her apartment at approximately 9:55 p.m., she saw the [petitioner] parked across the street from their apartments in his "burgundy or maroon" 1993 Grand Am. She stated that when she pulled out of the apartment complex, she saw the [petitioner] begin to follow her car without his lights on, and she testified that the [petitioner] followed her car to the victim's home, a drive which Mull testified took three to four minutes. Mull reported that after she dropped the victim off in front of his home and turned her car around, the [petitioner] flashed his "high beams" at her car. Mull stated that she last saw the victim standing at the door to his home as she drove away.

Mull reported that the [petitioner] did not return home on the night of the murder, but she stated that the [petitioner] called her once that night. She recalled that at approximately 6:00 a.m. the following morning, the [petitioner] returned to their apartment to pick up clothes.

Mull testified that the [petitioner] normally carries a gun. Mull further testified that approximately a week prior to the homicide, she saw the [petitioner] put

mercury covered with candle wax on the tips of bullets. When she asked him what he was doing, the [petitioner] explained that the mercury "makes the bullet explode when it enters something."

On cross-examination, Mull acknowledged that she told police she believed the [petitioner] thought that his girlfriend, Lateeska Newberry, was in her car on the night of the murder. She explained to police that she thought the [petitioner] was jealous after seeing the victim and Newberry together at her apartment earlier in the evening. She stated that she had known the [petitioner] to be jealous "[o]ver [Newberry]." However, she stated that while the victim was at her apartment on the day of the murder, the victim and Newberry were not affectionate and were "sitting across the room from each other."

Charles Edward Milem, the victim's uncle, testified that the victim was living with him at the time of his death. Milem testified that he was in his bedroom when the victim was shot. Milem recalled that from his bedroom window, he saw the victim get out of Mull's car and walk to the front porch of their home. As Mull's car pulled away, Milem saw another car immediately pull up on "the wrong side of the street." Milem next heard the victim ring the doorbell, and he then heard voices calling the victim. Milem testified, "One voice said, hey. My nephew repeated, who [sic] there, who [sic] there. And another voice immediately said, come here." Following this, Milem heard three gunshots, which he claimed came from the car that had pulled up after the victim was dropped off. At this point, he could no longer see the victim standing in the street. Milem rushed to the door, saw the victim lying in the street, and saw a car pull away. Milem stated that the car from which the shots were fired "looked white up under the street lights" and "sound[ed] like a Cutlass." When Milem approached the victim, he noticed that the victim's hands were still in his pockets.

Byron Braxton of the Memphis Police Department testified that he was called to the crime scene on March 10, 1997. He recalled that when he arrived at the scene, paramedics were already there. Braxton testified that he saw the victim lying face-down in the middle of the street, and when the paramedics rolled him over, Braxton saw that the victim's hands were still in his pockets. He stated, "[T]he shooter wasn't there to our knowledge. The consensus of the witnesses were that they saw a white box-type Chevy headed toward [a nearby street]. It was occupied by two to three male blacks. But they really couldn't give a description on the individual." Officers recovered three nine-millimeter shell casings from the scene. They also found a bullet lodged in the door of a house near the home in which the victim lived.

The State introduced the [petitioner's] March 13, 1997 statement through the testimony of Memphis Police Sergeant Dwight Woods. Woods participated in taking the [petitioner's] statement, which including the following:

Q.  Terry, do you know Keith Milem?

A.  Yes.

Q.  Are you aware that Keith Milem was shot and killed on Monday, March 10, 1997 at approximately 10:00 PM in front of 610 Loraine Drive?

A.  Yes.

Q.  Did you shoot Keith Milem?

A.  Yes.

Q.  What did you shoot Keith Milem with?

A.  A Smith and Wesson 9mm Automatic.

Q.  How many times did you shoot Keith Milem?

A.  I don't know.

Q.  Why did you shoot Keith Milem?

A.  Because he attacked me and hit me in the face and grabbed my arm.

Q.  Terry, tell me in your own words exactly what occurred before, during and after the shooting?

A.  Well from a couple of days before the shooting I heard my roommate Kim and my girlfriend Ranata talking about their cousin Keith or "Black" which is what they called him and I was suspicious about him the whole time and the day of the shooting he came to my home at 1104 Craft Road # 1 (Southern Hills Apartments). I came home at about 9:00 that evening and saw him and my girlfriend talking. He was on the couch and she was on the love seat directly in front of him talking. So, I left[,] . . . thinking that they may be having a relationship, I was mad.

I left my apartment and when I returned I saw my roommates [sic] car leaving the apartments and I thought my girlfriend

-4-

was in the car also so I followed them to talk to my girlfriend but when they got to Keith's house Ranata was not in the car so I stopped to talk to Keith. I called Keith to the car and asked him what was up and he asked what was I talking about and I asked was him and Ranata in a relationship and he told me that it wasn't my business so I told him that it was my business and it seems as if he saw my gun on the seat and looking at the gun, he hit me on the left side of my face and like dove into the car. I grabbed my gun, he grabbed my arm and I snatched away from him and pointed my gun at him and pulled the trigger. When I saw him fall, I took off. After I left I went to the Kings Gate Apartments and got into a fight with a young man and then I went to Orange Mound where I hid my gun in abandoned apartment building on Arbra.

Q. Terry, when you were following Kim and Keith, did you have your lights on or off?

A. I had my lights on but I turned them off when we got to the corner of Tulane and Shelby Drive to see who was in the car but I could not.

Q. Terry, what direction did you leave after you shot Keith?

A. East on Loraine towards Tulane, I turned left and went north on Tulane to Shelby Drive. Turned right on Shelby Drive and went east.

Q. Terry, describe your car that you drive?

A. I drive a burgundy Pontiac Grand AM, 1993, 2-door SE.

Q. Terry, does your car have fog lights on it?

A. Yes sir, it has white fog lights.

Q. Terry, do you know if Keith was drinking or drunk?

A. Yes. He was drinking a gallon of wine with a friend in my home when I left. When I left and came back, he was still drinking some of the wine a while later.

Q. Terry, were you drinking or using any type drugs?

-5-

A.      No sir.

Q.      Terry, did you recently put the mercury out of a thermometer into the end of the bullets that were in your gun and cover the ends with candle wax?

A.      Yes sir[,] . . . I did that but not recently.  It was when I first moved in to [sic] the apartment.

Q.      Terry, when you first encountered Keith, was it your intention to shoot him?

A.      No.

Q.      Terry, is there anything else you can add to this statement that would aid in this investigation?

A.      Yes sir, I'm sorry for what happened.  I wish I could take it back.

Q.      Did you give this statement of your own free will without any promises, threats or coercion?

A.      Yes.

Q.      Were you advised of your rights before you gave this statement?

A.      Yes.

The [petitioner] testified on his own behalf at trial.  He claimed that on one of the occasions while he was away from his apartment on the afternoon prior to the murder, he received a page from his girlfriend, who was at his apartment with Mull and the victim.  The [petitioner] stated that as he drove back to his apartment in response to the page, he passed Mull's car on the road.  He testified that he believed his girlfriend was in the car with Mull, and he therefore "blinked" his lights at Mull's car.  The [petitioner] maintained that when Mull didn't stop, he blew his horn and flashed his lights a second time.  He then followed her.  The [petitioner] maintained that he turned off his lights in order to see who was in Mull's car.  He explained, "I couldn't see because her car . . . had been in an accident.  It was real . . . crushed up on one side, and I couldn't see in it."  The [petitioner] stated that he followed Mull's car, continuing to try to get her attention, but eventually lost the car after he turned around.

The [petitioner] testified that after losing sight of Mull's car, he saw the victim standing in the yard of his uncle's home. The [petitioner] recalled that he "called [the victim] over" to his car. When the victim approached, according to the [petitioner], the two men engaged in an argument about the [petitioner's] girlfriend. The [petitioner] described the victim as angry and stated that the victim's speech was slurred. The [petitioner] maintained that during the argument, the victim hit him, and he tried to "fend [the victim] off." The [petitioner] claimed that the victim then "dove in[to]" his car, while still hitting the [petitioner], and attempted to grab the [petitioner's] gun, which was in plain view. According to the [petitioner], he tried to push the victim out of the car, and as he pushed the victim away, he raised his gun and shot the victim.

The [petitioner] admitted that at the time he shot the victim, he was "enraged." The [petitioner] also admitted that on the night of the murder, he was "suspic[ious]" that the victim and Newberry, his girlfriend, were starting a relationship. He testified that on the day of the shooting, he and Newberry were in "a fight" and were not really speaking. The [petitioner] recalled that he was "upset at [his] girlfriend."

The [petitioner] testified that on the day of the shooting, he retrieved his gun from the apartment that he shared with Mull because of Mull's "under-age daughter and just for safety reasons." He admitted to putting mercury on the tips of bullets, stating that "if [the mercury] got into a person . . . it would make the wound more severe." However, the [petitioner] maintained that he altered his bullets solely "for protection."

State v. Terry Norris, No. W2000-00707-CCA-R3-CD, 2002 WL 1042184, at **1–5 (Tenn. Crim. App., at Jackson, May 21, 2002), perm. to appeal denied (Tenn. Nov. 4, 2002).

The petitioner filed a *pro se* petition for post-conviction relief, followed by an amended petition after the appointment of counsel and a supplement to amended petition. Pertinent to this appeal, the petitioner alleged that appellate counsel was ineffective for not correctly stating his State v. Huddleston, 924 S.W.2d 666 (Tenn. 1996), issue[1] in his application for permission to appeal to the Tennessee Supreme Court and failing to raise as an issue in both his motion for a new trial and his direct appeal the trial court's erroneous jury instruction on the definition of "knowingly."

---

[1] In Huddleston, our supreme court held that a judicial determination of probable cause must occur within forty-eight hours of a warrantless arrest to protect a defendant's Fourth Amendment rights. 924 S.W.2d at 672. A confession obtained in violation of this forty-eight-hour time-line is subject to being excluded under a "fruit of the poisonous tree" analysis. Id. at 674.

**Evidentiary Hearing**

**Petitioner's Proof**

At the petitioner's evidentiary hearing, Lieutenant A.J. Christian of the Brighton Police Department testified that in 1997 he was a detective with the Memphis Police Department's Homicide Bureau involved in the petitioner's case. Christian said that the petitioner's arrest report showed that he was in police custody at the homicide office on March 11, 1997, at 7:30 p.m. He could not recall the exact time that the petitioner was taken into custody and explained that the arrest ticket would have the actual time and that the arrest narrative report "was just a supplement documenting the course of action that was taken after he was taken into custody."

Marcia Daniel, the petitioner's mother, testified that on March 11, 1997, police officers "called between 4:30 [p.m.] and five looking for [the petitioner]." Daniel located the petitioner and said he arrived home "between five and 5:15 [p.m.]." The police, who had arrived at the residence "maybe three to five minutes" before the petitioner, left with him "approximately about 5:45" p.m. Daniel testified that she told trial counsel, but not appellate counsel, of these events. Daniel acknowledged that the petitioner called her on March 13, 1997, and that, although she could not recall the time of the phone call, he told her he had agreed to talk to the police but wanted to talk with her first.

Trial counsel testified that during his representation of the petitioner, he believed he had "open-file discovery" from the State. Asked if he was aware that the petitioner was in police custody at 7:30 p.m. on March 11, 1997, trial counsel stated "that either [he] was aware or [he] should have been aware. [He], frankly, [did not] remember if anything was on the arrest ticket or not." Trial counsel said that at the time he argued the petitioner's motion to suppress his statement to police, he was aware of the "[t]he 48 hour rule" announced in <u>Huddleston</u> but acknowledged he "failed to raise that issue." Trial counsel also acknowledged that he did not object to the definition of "knowingly" in the jury instructions. On cross-examination, trial counsel testified that prior to the petitioner giving his statement on March 13, 1997, he was presented with "an advice of rights form" at 4:05 p.m. and signed it at 4:12 p.m.

The petitioner testified that he told appellate counsel that he was arrested at his mother's house on March 11, 1997, "[b]efore 7 p.m." and that more than forty-eight hours passed before he gave his statement to police on March 13, 1997. He acknowledged that the advice of rights form showed that he was given the form at 4:05 p.m. and that he signed it at 4:12 p.m. on March 13, but said he did not put the time on it and could not recall exactly what time he signed it, only remembering "[it] was after the evening meal in the jail." The petitioner also acknowledged signing his police statement at 8:20 p.m. and said that he actually gave the statement verbally before this time.

On cross-examination, the petitioner acknowledged that he was not in custody at 4:05 p.m. on March 11, 1997. He testified that the police initially came to his mother's house that day at 6:05

p.m., but left because he was not at home, and then returned "[s]omewhere around" 7:00 p.m. to question him. He acknowledged that he agreed to talk to the police on March 13, 1997, in exchange for being allowed to talk to his mother, stating that he was able to reach her at 6:50 p.m.

## State's Proof

Appellate counsel testified that he represented the petitioner on his motion for a new trial and on appeal. Discussing the petitioner's Huddleston claim, which he raised in the petitioner's motion for a new trial and on appeal, appellate counsel said he focused on the fact that the petitioner's confession "was clearly illegal" because "from the record [the police] didn't have probable cause to arrest [the petitioner] in the first place." Asked if he thought the amount of time the petitioner was in custody prior to giving his confession was a valid issue to pursue, appellate counsel answered that he "apparently" did not because he did not raise it on appeal. As for the jury instructions defining "knowingly," appellate counsel stated that "there's no question that there was an error in the jury instructions, but [he did not] think there was any question that it was harmless error" and, therefore, did not raise it in the motion for a new trial or on appeal.

## ANALYSIS

On appeal, the petitioner argues that appellate counsel was ineffective for failing to show at his motion for a new trial hearing that his police statement was taken more than forty-eight hours after he was arrested without a warrant in violation of the holding in Huddleston and for failing to raise as an issue in his motion for a new trial or on appeal the trial court's erroneous definition of "knowingly." We will address these issues separately.

## I. Standard of Review

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2003). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

## II. Ineffective Assistance of Counsel

In order to determine the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997)

(noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The United States Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984), which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective. The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." Id. at 685, 104 S. Ct. at 2063. The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064. The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065. The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)).

As for the prejudice prong of the test, the Strickland Court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would be different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different").

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim).

We note that when post-conviction proceedings have included a full evidentiary hearing, as was true in this case, the trial judge's findings of fact and conclusions of law are given the effect and

weight of a jury verdict, and this court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997). A person charged with a criminal offense is not entitled to perfect representation. See Denton v. State, 945 S.W.2d 796, 796 (Tenn. Crim. App. 1996). As explained in Burns, 6 S.W.3d at 462, "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another."

Finally, in determining whether appellate counsel was ineffective, the same Strickland standards discussed above are applied and the "[p]etitioner must show that counsel's performance was deficient and that petitioner was prejudiced by this deficiency." See Porterfield v. State, 897 S.W.2d 672, 678 (Tenn. 1995) (citing Cooper v. State, 849 S.W.2d 744, 746-47 (Tenn. Crim. App. 1993)). "Generally, the determination of the issues to present on appeal addresses itself to the professional judgment and sound discretion of appellate counsel." Id. (citing Cooper, 849 S.W.2d at 747).

### III. **Huddleston** Violation

The petitioner argues that "appellate counsel was ineffective for failing to show at [his] motion for new trial hearing that [his confession] was given more than 48 hours after his arrest in violation of State v. Huddleston." However, in the petitioner's direct appeal, this court determined there was no Huddleston violation, specifically explaining:

> At the hearing on the motion to suppress the [petitioner's] statement, the evidence revealed that the [petitioner] was taken into police custody for questioning without a warrant on the evening of March 11, 1997. Officers transported the [petitioner] to the Memphis Police Department Homicide Office for a formal interview. There, he was advised of his rights. According to officers, the [petitioner] refused to sign a waiver of rights form, but agreed to talk to the officers. At the time, the [petitioner] denied any involvement in the death of the victim. At 8:20 p.m. on March 11, 1997, the [petitioner] was allowed to telephone his mother. Officers then booked the [petitioner] into jail. The [petitioner's] "arrest ticket" indicated that the [petitioner] was arrested at 8:45 p.m. on March 11, 1997.
>
> An officer who participated in questioning the [petitioner] testified that on March 13, 1997, the [petitioner] was again advised of his rights, and he signed a waiver of rights form at 4:05 p.m. The [petitioner] then told officers that he did not

wish to make a statement until he spoke to his mother, and the officers therefore allowed the [petitioner] to telephone his mother at 6:50 p.m. At 7:20 p .m., the [petitioner] made a statement to the officers, in which he confessed to shooting the victim.  At 8:20 p.m., the [petitioner] signed the typewritten statement that he made to police.  The officers then allowed the [petitioner] to make another phone call at 8:23 p.m.  According to one officer, during the [petitioner's] interview on March 13, the officers fed him a meal.

. . . .

In this case, the [petitioner] was arrested at 8:45 p.m. on March 11, 1997, and he confessed to the crime at 8:20 p.m. on March 13, 1997.  An arrest warrant was obtained on March 14, 1997.  Thus, although the [petitioner] was detained without a warrant and without a judicial determination of probable cause, he was not held for more than forty-eight hours prior to his confession.  As our supreme court has noted, "if the statement was given prior to the time the detention ripened into a constitutional violation, it is not the product of the illegality and should not be suppressed."  Huddleston, 924 S.W.2d at 675.

Terry Norris, 2002 WL 1042184, at **7–9.[2]

In its order denying the petitioner post-conviction relief, the post-conviction court found the petitioner's Huddleston argument to be without merit:

Although the Huddleston issue was addressed on direct appeal, the Court will quickly address the issue in regard to the ineffective assistance of counsel claim against Appellate Counsel.  Petitioner asserts that his statement should be excluded as "fruit of the poisonous tree" because it was given after forty-eight (48) hours of detention with no probable cause determination.  However, the testimony does not support the claim.  The Petitioner signed an Advice of Rights form at 4:12 P.M. on March 13, 1997.  The testimony of Petitioner's mother indicated the police left her home around 5:45 P.M. on March 11, 1997.  The Petitioner admitted that he was not in custody at 4:05 P.M. on March 11, 1997; and also admitted he agreed to talk with police around 4:05 P.M. on March 13, 1997.  The Petitioner stated that he agreed to speak with police in order to get a phone call to his mother.  His testimony further indicated that he then tried to contact his mother but was unable to reach her until about 6:50 P.M. on March 13, 1997.  The Police stuck to their word and waited until the Petitioner was able to speak to his mother before taking his statement.  The

[2]In addition to determining that the petitioner was not held more than forty-eight hours prior to giving his statement to police, this court also found the police had probable cause to arrest the petitioner on March 11, 1997.  Terry Norris, 2002 WL 1042184, at *10.

Petitioner cannot claim the time period was over forty-eight (48) hours when it was due to his desire to speak with his mother before making his statement.

We agree with the post-conviction court that this issue is without merit. Although the petitioner contends that his direct appeal would have turned out differently had appellate counsel showed that he was in custody more than forty-eight hours at the time he gave his statement to police, he has failed to meet his burden of showing that he actually was in custody more than forty-eight hours prior to giving his confession at 7:20 p.m. on March 13, 1997. On direct appeal, this court found the petitioner was arrested at 8:45 p.m. on March 11, 1997. At the post-conviction hearing, there was only conflicting testimony offered as to when the petitioner was taken into custody, but no records were entered into evidence to show that this court erred when, on direct appeal, it concluded that the petitioner was arrested on March 11, 1997, at 8:45 p.m. Accordingly, the record supports the determination of the post-conviction court that this claim is without merit.

### IV. Definition of "Knowingly"

The petitioner argues that "appellate counsel was ineffective by failing to raise as an issue in [his] motion for new trial, or as plain error on appeal, the trial court's failure to give the proper jury instruction correctly defining the *mens rea* requirement of knowingly as a result of conduct offense." During the petitioner's second degree murder trial, the trial court gave the following instruction on the definition of "knowingly":

> "Knowingly" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that their conduct is reasonably certain to cause the result.

In State v. Page, this court explained that "a knowing second degree murder is strictly a 'result-of-conduct' offense. The result of the conduct is the only conduct element of the offense; the 'nature of the conduct' that causes death is inconsequential." 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002) (citing State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000)). In State v. Faulkner, 154 S.W.3d 48, 59 (Tenn. 2005), our supreme court clarified that "superfluous [nature-of-conduct] language in the 'knowingly' definition did not lessen the burden of proof because it did not relieve the State of proving beyond a reasonable doubt that the defendant acted knowingly" and, therefore, constituted harmless error. The petitioner concedes in his brief "that if the Tennessee Supreme Court's holding in Faulkner is correct, it would negate any argument that [appellate counsel] should have raised the erroneous definition of knowingly given by the trial court for the first time on appeal." This court is without authority to rule that Faulkner was wrongly decided. Accordingly, this issue is without merit.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgment of the post-conviction court.

_____
ALAN E. GLENN, JUDGE