# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs December 7, 2010

## STATE OF TENNESSEE v. MICHAEL MARTIN

**Direct Appeal from the Criminal Court for Shelby County**
**No. 07-06810    Paula Skahan, Judge**

---

**No. W2010-00466-CCA-R3-CD  - Filed March 30, 2011**

---

The defendant, Michael Martin, was convicted by a Shelby County Criminal Court jury of attempted second degree murder, a Class B felony; aggravated assault, a Class C felony; and violation of an order of protection, a Class A misdemeanor.  The aggravated assault conviction merged into the attempted second degree murder conviction, and the defendant was sentenced to eighteen years as a Range II offender on the attempted second degree murder conviction and eleven months, twenty-nine days on the violation of an order of protection conviction, to be served consecutively.  On appeal, the defendant argues that (1) the trial court erred in allowing photographs of the victim's wounds into evidence; (2) the trial court erred in allowing evidence regarding injuries the victim's grandparents sustained during the commission of the offense; (3) the evidence is insufficient to sustain his conviction for attempted second degree murder; (4) the cumulative effect of the errors at trial was sufficient to justify a new trial; and (5) the trial court erred in sentencing him as a Range II offender.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Joseph A. McClusky (on appeal); and Jeffery Woods (at trial), Memphis, Tennessee, for the appellant, Michael Martin.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; William L. Gibbons, District Attorney General; and Betsy Carnesale, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

# FACTS

This case is the result of the defendant's stabbing his estranged wife, Dekimbra Watson, for which he was indicted on charges of attempted first degree premeditated murder, aggravated assault, and violation of an order of protection.

At trial, the victim testified that she was the defendant's wife and had known him "[a]ll [her] life." She began dating the defendant in 2004, and the two were married in November 2005. A year and a half later, the victim moved out because she was tired of the defendant's "[a]busive, arguing and controlling" behavior and went to live with her grandparents, James and Barbara Watson. After she moved out, the victim and the defendant were "back and forth" with regard to the future of their relationship, and she spent the night with him from time to time. However, in January 2007, the victim obtained an order of protection against the defendant because "[h]e was always calling . . . and following [her] different places." Even after the protection order, the victim and the defendant continued to contact each other and were occasionally romantically involved, but eventually the victim decided that "it was going to be a repeated cycle of doing the same stuff over and over again [and] wanted to be through with it."

On May 17, 2007, the defendant called the victim several times, questioning her about whether she was dating anyone and threatening, "I can get you if I want you[.]" When the victim left her grandparents' house with a girlfriend around 6:00 p.m. that evening, she noticed a suspicious car following them that she assumed was driven by the defendant. She had her friend take her home and, once she was out of the defendant's sight, went to a neighbor's house and waited until her grandparents came home around 9:00 p.m. The defendant began repeatedly calling her as soon as she got home, asking where she had been and why she would not return his calls. The victim eventually turned off the ringer on the phone.

Around midnight, the defendant "c[a]me beating on the door asking could he come in." The victim's grandfather let the defendant in and started talking to him. The victim was nearby but was not paying attention to what the defendant was saying because she "didn't want to hear it." After a few minutes, the defendant went to the restroom and, about five minutes after he returned, he "grabbed [the victim] and just went to sticking [her]." The victim did not see the defendant with a knife or anything sharp, but she knew that he frequently carried a pocketknife with a three- or four-inch blade. During the altercation, the victim's grandparents ended up on the floor. The defendant then ran outside, leaving the front door open. When the victim realized that she had been stabbed, she had her grandfather take her to the hospital where she was treated and released. She had one stab wound to her left breast, two to her left side, and one toward the top of her head. The next

day, the defendant called the victim and apologized.

The victim testified that she believed the defendant came to her grandparents' house that night with the intention of hurting her because she "could hear it in his voice [that] he was up to no good." She noted that the defendant's facial expression was "angry," which made her feel "scared."

Michael Triplett, records keeper for the Shelby County General Sessions Criminal Court, testified that the victim petitioned the court for an order of protection against the defendant on December 29, 2006. As the factual basis for the petition, the victim alleged that the defendant "accused her of cheating" and "hit her in the face with a closed fist; hit her in the nose, which caused her nose to spread and eye to blacken." She also alleged that the defendant threatened that the police could not stop him from getting to her and that "[i]f he gets locked up, he will be plotting on how he is going to get her." The victim further alleged that the defendant hit her in the head with a gun on December 13, 2006. The court issued an ex parte order, and the defendant was informed that a hearing would be held in two weeks. The defendant and the victim both appeared at the hearing on January 16, 2007, and a final order of protection was entered directing the defendant to stay away from the victim.

Barbara Watson, the victim's grandmother, testified the defendant came to their house the night of the incident around midnight wanting to talk to her and Mr. Watson about the defendant's relationship with the victim. Mr. Watson let the defendant in the house, and the three of them sat down in the kitchen and began to talk. At some point, the defendant went to the bathroom and, when he returned, stood in the doorway into the kitchen. The defendant said a few more words and then said, "'And you'" and lunged at the victim. Mrs. Watson stood up to stop the defendant from hitting the victim, but her chair tipped over and she fell to the floor bruising her arm. Mr. Watson tried to keep her from falling, but somehow fell himself. Mrs. Watson saw the defendant and the victim "tussling together," then the defendant left the house.

On cross-examination, Mrs. Watson acknowledged that the defendant did not shout or behave unruly during their conversation while seated at the kitchen table. Mrs. Watson observed that the victim did not say anything to the defendant prior to him lunging at her.

James Watson, the victim's grandfather, testified that on the night of the incident the defendant arrived at their house around midnight, saying that he needed to talk to him and Mrs. Watson. Mr. Watson let the defendant in the house, and the three of them sat at the kitchen table and discussed the relationship between the victim and the defendant. At some point, the victim entered the kitchen but would not sit down at the table when requested to

by the defendant. Mr. Watson observed that the defendant looked "upset" and like "[s]omething was on his mind." The defendant left the kitchen to use the restroom and, when he returned, did not sit down. The defendant said a few words, then said to the victim, "'And you,' and he grabbed her." It appeared to Mr. Watson that the defendant began hitting the victim, and when Mr. Watson saw this, he started to get up from the table, but the defendant's boot pushed Mr. Watson's leg and he fell to the floor. The defendant ran out of the house, and Mr. Watson saw that the victim had been stabbed in the head and side. A few days after the incident, while Mr. Watson was at the police station making a report, the defendant called him and apologized.

On cross-examination, Mr. Watson acknowledged that the defendant never yelled at them during their conversation but did somewhat raise his voice when he said, "'And you'" to the victim before the attack.

Officer Marcus Lee with the Memphis Police Department testified that he was dispatched to Methodist South Hospital to investigate the stabbing of the victim. The victim advised Officer Lee that the defendant had stabbed her. He recalled that the victim told him that the defendant had been calling her to meet and that she finally agreed to talk to him. She said that they were talking in the kitchen, then the defendant went to the restroom. Upon his return, the defendant grabbed an object and started stabbing her. Officer Lee saw the victim's head wound but did not see her body wounds.

After the conclusion of the proof, the jury convicted the defendant of the lesser-included offense of attempted second degree murder, as well as aggravated assault and violation of an order of protection as charged in the indictment.

## ANALYSIS

### I. Photographs

The defendant argues that the trial court should not have admitted photographs of the victim's injuries because the victim testified that she was stabbed four times, meaning the photographs were of little, if any, probative value and therefore could not outweigh the prejudicial effect.

At trial, the State sought to introduce photographs taken of the victim's injuries three days after the incident. The defendant objected on the basis that the photographs were cumulative and that the victim was not a competent witness to introduce them. The State responded that the photographs were relevant to show the nature, extent, and number of the victim's wounds in order to establish the defendant's intent to kill the victim. The State also

-4-

asserted that the photographs were not "particularly gruesome or gory," and that the victim was competent to testify given it was her body. The State agreed to introduce only one of two photographs of the victim's head wounds in response to the defendant's assertion that the photographs were cumulative.

After hearing the argument of counsel, the trial court overruled the defendant's objection, finding that the photographs were not gory or gruesome because "there's hardly any blood." The trial court also found that the photographs were relevant to show the location of the victim's wounds and that the victim was competent to testify about the photographs.

The admissibility of photographs generally lies within the sound discretion of the trial court and will not be overturned on appeal absent a clear showing that the trial court abused its discretion. State v. Faulkner, 154 S.W.3d 48, 67 (Tenn. 2005); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). "Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases." State v. Morris, 24 S.W.3d 788, 810 (Tenn. 2000). In determining whether a photograph is admissible, the trial court must first determine whether it is relevant to a matter at issue in the case. See Tenn. R. Evid. 401; State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998); Banks, 564 S.W.2d at 949. The court must next consider whether the probative value of the photograph is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403.

The defendant was indicted for attempted first degree premeditated murder, meaning the State had to prove the defendant's attempt to kill the victim was intentional. In proving this element, the State relied heavily on the number and extent of the injuries inflicted upon the victim. Although the victim and her grandparents testified that the victim suffered four stab wounds, the photographs give a better description of the nature and extent of the wounds for the purpose of establishing premeditation. We note that the photographs were not especially gory or gruesome and showed little blood. Therefore, we cannot conclude that the probative value of the photographs was substantially outweighed by the danger of unfair prejudice or that the trial court abused its discretion in admitting the photographs.

## II. Grandparents' Injuries

The defendant argues that the trial court erred in allowing irrelevant evidence that the victim's grandparents were injured during his encounter with the victim. However, the defendant has waived any issue concerning injuries sustained by the victim's grandparents because he failed to make a contemporaneous objection at trial. See Tenn. R. App. P. 36(a).

-5-

During a jury-out hearing regarding the admissibility of the order of protection the victim obtained against the defendant, the defendant also objected to the admissibility of photographs of the victim's grandparents depicting injuries allegedly sustained during the altercation. The defendant argued that the photographs were not relevant because the indictments were all regarding injuries to the victim and, even if relevant, the probative value was outweighed by the prejudicial effect. The trial court reserved ruling on the issue until the grandparents testified.

Later, Barbara Watson testified that she fell over a chair when she jumped up to help the victim and sustained a bruise on her arm. James Watson testified that he got up to help Mrs. Watson, but the defendant's "boot or something" pressed against his leg and he fell. The State did not attempt to introduce the photographs of Mr. and Mrs. Watson's injuries, and the only objection by the defense came when the prosecutor asked Mr. Watson if the defendant pressed his boot against Mr. Watson's leg on purpose. Before the trial court ruled on the objection, Mr. Watson stated, "[I]t was not on purpose."

As recited above, the defendant failed to specifically and contemporaneously object to the relevancy and prejudicial effect of Mr. and Mrs. Watson's testimony concerning the injuries they sustained. His earlier objection was clearly with regard to the admission of the photographs. He did include this issue in his amended motion for a new trial; however, he failed to include the transcript from the hearing in the record on appeal for us to review the trial court's analysis of the issue. Therefore, the defendant has waived appellate review of this issue. Moreover, even if not waived, we do not see how the defendant was prejudiced by the grandparents' testimony because it was not alleged that the defendant purposefully caused their injuries.

### III. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient that he possessed the requisite intent required for attempted second degree murder when he attacked the victim. He asserts that "the events leading up to the assault created adequate provocation to lead him to attack" the victim, making the offense an attempted voluntary manslaughter. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All

questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A person commits criminal attempt who, acting with the culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a) (2006).

Second degree murder is a knowing killing of another. Id. § 39-13-210(a)(1). A

person acts knowingly with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result. Id. § 39-11-106(a)(20).

In the light most favorable to the State, the evidence showed that the defendant suddenly and without provocation attacked the victim, stabbing her three times on her left side and once in the top of her head. Earlier that day, the defendant had made several phone calls to the victim, questioning whether she was dating anyone and threatening, "I can get you if I want you[.]" That evening, when the victim left her grandparents' house with a girlfriend, she noticed a suspicious car following them that she assumed was driven by the defendant. She took refuge at a neighbor's house until her grandparents got home, but as soon as she returned home, the defendant started calling repeatedly. When the defendant arrived at her house, the victim "could hear it in his voice [that] he was up to no good," and he had an "angry" facial expression. According to Mr. Watson, the defendant looked "upset" and like "[s]omething was on his mind" when he was at their house. Mr. Watson said that the defendant's attack was unprovoked and that the victim was not armed. By all accounts, the defendant ran out of the house immediately after stabbing victim. This evidence that the defendant armed himself with a deadly weapon, previously threatened to kill the victim, stabbed the victim four times, and then fled from the scene was sufficient for a rational trier of fact to conclude that the defendant knowingly attempted to kill the victim and that he did not act in a state of passion produced by adequate provocation.

## IV. Cumulative Affect of Alleged Errors

The defendant argues that the cumulative effect of the errors at trial was sufficient to justify a new trial. Having found no errors, we conclude that the defendant is not entitled to relief on the basis of cumulative error.

## V. Sentencing

The defendant argues that the trial court erred in sentencing him as a Range II offender because the court incorrectly analyzed the elements of one of his out-of-state convictions in determining his offender status.

When an accused challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2006). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing

-8-

the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses, (h) any statements made by the accused in his own behalf, and (i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

Prior to trial, the State filed a notice of intent to seek enhanced punishment, noting that the defendant had prior convictions in Arkansas for aggravated assault on August 23, 1995 and unlawful discharge of a firearm from a vehicle on July 23, 1996. At the sentencing hearing, the State submitted a report from the Arkansas Department of Community Punishment, which provided details of the defendant's criminal history in that state. The report also included a factual excerpt regarding the unlawful discharge of a firearm from a vehicle conviction that the defendant was observed by a police officer firing a semi-automatic firearm into a crowded park area, causing the death of an individual less than fourteen years old. The State asked the court to sentence the defendant as a Range II offender based on the Arkansas aggravated assault conviction being the equivalent of an aggravated assault conviction in Tennessee, a Class C felony, and on the Arkansas unlawful discharge of a firearm from a vehicle, a Class Y felony, being the equivalent of a second degree murder conviction in Tennessee, a Class A felony. The defendant did not contest that he had the two prior convictions or that an Arkansas aggravated assault conviction was equivalent to an aggravated assault conviction in Tennessee. He only asserted that the unlawful discharge of a firearm from a vehicle conviction was more akin to the Tennessee offense of criminally negligent homicide or perhaps reckless homicide.

In determining the defendant's offender classification, the trial court observed that the same offense was not proscribed in Tennessee but, in looking at the elements of the offense

and the penalty the defendant received, determined that an Arkansas conviction for unlawful discharge of a firearm from a vehicle was the equivalent to second degree murder in Tennessee. The court observed that the defendant's actions involved the knowing discharge of a firearm that caused the death of a child, so the offense was not "in any way, shape or form, criminally negligent that it was just an accident." The court surmised that shooting a gun into a crowd could be reckless homicide but that would be a question for a jury.

The trial court may sentence a defendant as a Range II, multiple offender when it finds beyond a reasonable doubt that the defendant has received "[a] minimum of two (2) but not more than four (4) prior felony convictions within the conviction class, a higher class, or within the next two (2) lower felony classes"; or alternatively, "[o]ne (1) Class A prior felony conviction if the defendant's conviction offense is a Class A or B felony." Tenn. Code Ann. § 40-35-106(a)(1), (2) (2006).

> Prior convictions include convictions under the laws of any other state, government, or country which, if committed in this state, would have constituted an offense cognizable by the laws of this state. In the event that a felony from a jurisdiction other than Tennessee is not a named felony in this state, the elements of the offense shall be used by the Tennessee court to determine what classification the offense is given.

Id. § 40-35-106(b)(5). "The appropriate analysis of prior convictions is under Tennessee law as it existed at the time of the out-of-state conviction." State v. Brooks, 968 S.W.2d 312, 313-14 (Tenn. Crim. App. 1997).

The Arkansas statute under which the defendant was convicted provides:

> (a)(1) A person commits unlawful discharge of a firearm from a vehicle in the first degree if he or she knowingly discharges a firearm from a vehicle and by the discharge of the firearm causes death or serious physical injury to another person.

Ark. Code Ann. § 5-74-107(a)(1). The offense of unlawful discharge of a firearm from a vehicle in the first degree is a Class Y felony. Id. § 5-74-107(a)(2). See id. § 5-1-106(b) (stating the hierarchy for felonies in Arkansas).

In 1996, the time of the defendant's conviction in Arkansas, Tennessee defined second degree murder, a Class A felony, as a "knowing killing of another." Tenn. Code. Ann. § 39-13-210(a)(1), (b).

"Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Id. § 39-11-302(b). Reckless homicide, a Class D felony, was defined as "a reckless killing of another." Id. § 39-13-215.

"Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Id. § 39-11-302(c). Criminally negligent homicide, a Class E felony, was defined as "[c]riminally negligent conduct which results in death[.]" Id. § 39-13-212.

"Criminal negligence" refers to a person who acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Id. § 39-11-302(d).

We have compared the elements of the offenses and agree with the defendant that the trial court incorrectly determined that the knowing discharge of a firearm from a vehicle that results in death or serious physical injury was the equivalent of a knowing killing of another. The "knowing" mens rea for the Arkansas offense clearly refers to the discharge of the firearm, not that the defendant be aware that his actions would be reasonably certain to cause death to another. However, contrary to the defendant's urging, we do not see how the knowing discharge of a firearm from a vehicle into a crowded park area that resulted in the death of another could be equated to a criminally negligent homicide when the firing from the vehicle was not the product of obliviousness to a substantial and unjustifiable risk.

Instead, it is our view that the Arkansas offense of unlawful discharge of a firearm from a vehicle in the first degree is more akin to the Tennessee offense of reckless homicide. It can certainly be said that one who discharges a firearm from a vehicle into a crowded park area would have to be aware of, and consciously disregarded, the substantial and unjustifiable risk associated with that action. As such, the defendant has the equivalent of a prior Class C felony conviction for the aggravated assault conviction that is not in question, and a Class D felony conviction for the "reckless homicide" conviction. Therefore, the defendant was still properly sentenced as a multiple offender because he was presently convicted of a Class B felony and he had two prior felony convictions within the next two lower felony classes.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE